**CHANDRA L. PETERSON**
California State Bar No. 306935
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Facsimile: (619) 687-2666
Chandra_Peterson@fd.org

Attorneys for Mr. Ruiz-Rivera

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>J. INES RUIZ-RIVERA,<br><br>Defendant. | CASE NO.:   20-MJ20306-AHG<br><br>Hon. Allison H. Goddard<br>Date: March 24, 2020<br>Time: 9:30 a.m.<br><br>MR. RUIZ'S MOTION TO DISMISS THE COMPLAINT |

## I.    INTRODUCTION

The Court should dismiss the complaint charging Mr. Ruiz with illegal entry under 8 U.S.C. § 1325 for multiple reasons. First, the Court should dismiss because the complaint fails to allege all of the elements of the offense. Additionally, the statute is unconstitutional under *Morales-Santana*, the non-delegation clause and is unconstitutionally vague. Finally, the prosecution violates equal protection and due process on the basis of disparate treatment with other defendants charged with similar petty offenses in the Southern District of California and 8 U.S.C. § 1325.

## II.    STATEMENT OF FACTS

In the morning on February 4, 2020, Mr. Ruiz was arrested at the Jacumba Community Center. *See* Dkt. No. 1. He was transported to a nearby Border Patrol station, where he was held for the day into the next morning when he was brought

1   to Court. Conditions at Border Patrol stations along the U.S./Mexico border have

2   been described as "inhumane and punitive"—arrestees sleep on a concrete floor in

3   very cold temperatures and receive little food or water. *See* Exhibits A, B, C, D, E.

4   One station held 900 people even though its maximum capacity was 125; detainees

5   were frequently forced to wear soiled clothing and stand on toilets in order to have

6   enough air to breathe. In the last year, at least seven children have died after being

7   held in such stations. Mr. Ruiz was held in a Border Patrol station under similar

8   conditions.

9       On the morning of February 5, 2020, pursuant to the procedures of the

10  Southern District of California's "Streamline Court," Mr. Ruiz met with appointed

11  counsel in a converted garage used for initial attorney-client meetings. During this

12  meeting, Mr. Ruiz was shackled.

13      That afternoon, Mr. Ruiz had the initial appearance and arraignment. The

14  Government moved to detain on the basis that his undocumented status meant that

15  he had no ties to the community and was thus a flight risk. Despite these allegations,

16  Mr. Ruiz had no criminal history or immigration history and strong family ties. The

17  Magistrate Judge granted the government's motion relying on the fact that counsel

18  had not been successful in her efforts to contact Mr. Ruiz's family. Mr. Ruiz

19  remained in custody, without the phone numbers for his family because they were

20  on his phone in the custody of the government. Finally, counsel was able to contact

21  Mr. Ruiz's family through social media and bond was set in the amount of

22  $8,000.00 personal appearance bond secured by a 50% cash deposit with one

23  financially responsible adult. Bond was posted and Mr. Ruiz was released nearly

24  three weeks after his arrest.

25      These motions follow.

26

27

28

## III.    ARGUMENTS

### A.    This Court should Dismiss the Complaint because it fails to allege all the elements of the charged offense.

A charging document must include the "essential facts constituting the offense charged[.]" FED. R. CRIM. P. 7(c)(1). That is, a charging document "must set forth each element of the crime that it charges." *Almendarez-Torres v. United States*, 523 U.S. 224, 228 (1998). A charging document "that tracks the words of the statute violated is generally sufficient" to allege the elements of an offense. *United States v. Jackson*, 72 F.3d 1370, 1380 (9th Cir. 1995). But not always. *See United States v. Resendiz-Ponce*, 549 U.S. 102, 109 (2007). "[I]mplied, necessary elements, not present in the statutory language, must be included in an indictment." *Jackson*, 72 F.3d at 1380; *accord United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999). Thus, in general, if a "statute is silent on *mens rea*," the government must allege the *mens rea* in the charging document. *United States v. Morrison*, 536 F.2d 286, 288 (9th Cir. 1976); *see also Du Bo*, 186 F.3d at 1179. If a charging document fails "to recite an essential element of the charged offense," that is a "'fatal flaw requiring dismissal'" of the charging document. *United States v. Omer*, 395 F.3d 1087, 1088 (9th Cir. 2005) (applying rule to an indictment); *see also United States v. Hatch*, 919 F.2d 1394, 1398 (9th Cir. 1990) (applying rule to an information); *Hotch v. United States*, 208 F.2d 244, 250 (9th Cir. 1953) (applying rule to a complaint).

Here, the government has charged Mr. Ruiz with violating the attempt portion of § 1325(a)(1). Its charging document, however, is deficient because it fails to contain the implied *mens rea* for the attempt portion of § 1325(a)(1). It fails to allege that Mr. Ruiz knew he was an "alien" when he attempted to enter the United States. As a result, this Court must dismiss this case because the charging document fails to allege the elements of the charged offense.

1.    <u>If a defendant believes he is a U.S. citizen, he has not committed an attempted illegal entry.</u>

To commit an attempt offense, the defendant must have the "intent to commit the underlying offense" and commit an "overt act constituting a substantial step towards the commission of the offense." *United States v. Gonzalez-Monterroso*, 745 F.3d 1237, 1243 (9th Cir. 2014) (internal quotation marks omitted). Under the intent element, "a defendant should be treated in accordance with the facts as he supposed them to be," not as they actually are. *United States v. Quijada*, 588 F.2d 1253, 1255 (9th Cir. 1978); *accord United States v. Hinkson*, 585 F.3d 1247, 1265 n.27 (9th Cir. 2009); *United States v. Steward*, 16 F.3d 317, 320 n.4 (9th Cir. 1994). A defendant is guilty of attempt, then, only if, under the facts as he believes them to be, his intended acts would amount to the underlying offense. So if a defendant bought a substance he thought was cocaine, he is guilty of attempting to purchase a controlled substance, even if the substance is actually powdered sugar. *Hinkson*, 585 F.3d at 1265 n.27. Conversely, if under the defendant's understanding of the facts "the result desired or intended it not a crime, the actor will not be guilty of an attempt even [if] he firmly believes that his goal is criminal." Wechsler, Jones & Korn, *The Treatment of Incohate Crimes in the Model Penal Code of the American Law Institution: Attempt, Solicitation, and Conspiracy*, 61 COLUM. L. REV. 571, 579 (1961) [*hereinafter* "Wechsler"].

Applying this logic to § 1325(a)(1) establishes that a defendant commits attempted illegal entry only if he knows that he is an "alien." *See* 8 U.S.C. § 1325(a)(1). If a defendant genuinely (but incorrectly) believes that he or she is a U.S. citizen, and then enters the United States, the defendant is not an alien who enters the United States under the "facts as [he or she] supposed them to be[.]" *See Quijada*, 588 F.2d at 1255.

Even though knowledge of alienage is an element of an attempted illegal entry, the charging document does not allege that *mens rea*. Thus, the charging

document contains a "fatal flaw requiring dismissal[.]" *See Pernillo-Fuentes*, 252 F.3d at 1032 (internal quotation marks omitted).

### 2.   If a defendant believes he is a U.S. citizen, he has not committed any offense in § 1325(a), including attempted illegal entry.

As just explained, basic principles of attempt law require that the government prove in an attempted illegal entry case that the defendant knew he was an alien. But, setting that argument aside, anytime the government charges a defendant with committing any offense in § 1325(a), the government must prove that the defendant knew he was an alien.

To determine the particular *mens rea* for an element of a criminal offense, this Court must begin with the "longstanding presumption, traceable to common law, that Congress intends to require a defendant to possess a culpable mental state regarding 'each of the statutory elements that criminalize otherwise innocent conduct.'" *Rehaif v. United States*, 139 S. Ct. 2191, 2195 (2019) (quoting *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994)). This presumption helps to "separate wrongful from innocent acts." *Id*. at 2197. The presumption applies "even when Congress does not specify any scienter in the statutory text" and "where the most grammatical reading of the statute does not support" a scienter. *Id*. at 2197 (internal quotation marks omitted). Indeed, statutes that require no *mens rea*—that is, strict-liability offenses—"generally are disfavored," and are "limited" to so-called "'public welfare' or 'regulatory' offenses" that "regulate potentially harmful or injurious items." *Staples v. United States*, 511 U.S. 600, 606-07 (1994).

Recently, the Supreme Court in *Rehaif* addressed how the presumption of *mens rea* applies to an offense that requires the government to prove that the defendant is an "alien." At issue was a statute that makes it a crime for "felons and aliens who are 'illegally or unlawfully in the United States'" to possess a firearm. 139 S. Ct. at 2194 (quoting 18 U.S.C. § 922(g)). The question was: did the defendant need to know "both that he engaged in the relevant conduct (that he

possessed a firearm) and also that he fell within the relevant status (that he was a felon, an alien unlawfully in this country, or the like)?" *Id*. The Court answered "yes." The Court determined that there was "no convincing reason to depart from the ordinary presumption in favor of scienter." *Id*. at 2195. The Court noted that but for the defendant's status, his conduct was lawful. *Id*. at 2197. "It is therefore the defendant's *status*, and not his conduct alone, that makes the difference." *Id*. (emphasis in original). Thus, the Court held that the government needed to prove both that the defendant knew that he had engaged in the relevant conduct and that he fell within the relevant status.

With respect to § 1325(a), there is "no convincing reason to depart from the ordinary presumption in favor of scienter." See 139 S. Ct. at 2195. Just as in *Rehaif*, "the defendant's *status*, and not his conduct alone, that makes the difference" between criminal and non-criminal conduct. *See Rehaif*, 139 S. Ct. at 2197. A U.S. citizen who just enters or attempts to enter the United States at a non-designated time or place has committed no offense.[1] As a result, to convict a defendant of violating § 1325(a)(1), the government must prove both that the defendant knew that he had "engaged in the relevant conduct" (that he entered or attempted to enter the United States) and also that he knew "that he fell within the relevant status" (that he was an alien). *See Rehaif*, 139 S. Ct. at 2194.

In charging Mr. Ruiz with violating § 1325(a)(1), the government needed to allege explicitly that Mr. Ruiz knew he was an alien, an "implied, necessary element[], not present in the statutory language[.]" *See Jackson*, 72 F.3d at 1380. Thus, the proposed charging document fails to allege all the elements of the charged

---

[1] A U.S. citizen commits a crime only by "intentionally" failing to "enter the United States . . . at a border crossing point designated by the Secretary" and then not "reporting the arrival" and "present[ing] themselves, and all articles accompanying them[,] for inspection." *See* 19 U.S.C. § 1459(a), (e), (g). Thus, if a U.S. citizen enters the United States at a non-designated time or place, no crime has been committed unless the U.S. citizen both intentionally entered outside a border crossing and intentionally failed to present promptly for inspection.

offense, and this Court must therefore dismiss it. *See Du Bo*, 186 F.3d at 1179–80.

## B. The Court Should Dismiss the Complaint because it violates equal protection under *Morales-Santana*

The offense of 8 U.S.C. § 1325 makes it a crime for "any alien" to enter or attempt to enter the United States outside a port of entry. Congress defined the term "alien" as "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3). In *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686, 1700–01 (2017), the Supreme Court held that the statutes transmitting citizenship to children born abroad violate equal protection under the Fifth Amendment's Due Process Clause—they treat children of unwed mothers and unwed fathers differently. Because the citizenship laws create an unconstitutional exception that favors unwed mothers over unwed fathers, and the offense charged rests on these invalid statutes, the offense itself is unconstitutional. Thus, this Court must dismiss.

## C. Congress violated the non-delegation doctrine when it enacted 8 U.S.C. § 1325(a)(1), and this Court must therefore dismiss.

Under 8 U.S.C. § 1325(a)(1), Congress made it a crime for any "alien" to "enter[] or attempt[] to enter the United States at any time or place other than as designated by immigration officers[.]" An "immigration officer" is "any employee . . . designated by the Attorney General . . . to perform the functions of an immigration officer," 8 U.S.C. § 1101(a)(18). "Border patrol agent[s]" are considered immigration officers. 8 C.F.R. § 287.5(c)(1)(i)(c)(1)(i). Congress, then, made it a crime for a non-citizen to enter, or attempt to enter, the United States during a time or at a place that any immigration officer, including any Border Patrol agent, has not designated for entry. That means whether a defendant's conduct amounts to a crime depends on what an executive-branch official has designated. Congress, then, has delegated to the executive branch the ability to define a criminal provision's scope.

At issue is whether § 1325(a)(1) violates the non-delegation doctrine. The doctrine prohibits Congress from delegating away its *core* legislative functions to another branch of government. As explained below, in § 1325(a)(1), Congress delegated to immigration officers the ability to designate places for entry for purposes of immigration law. Congress, however, did not provide *any* guidance about how those officials should exercise their discretion. Guidance was needed. Immigration officers could designate physical port facilities *or* geographic areas for entry. Immigration officers chose physical port facilities. But they didn't have to. In fact, when Congress delegated to the Secretary of Treasury the ability to designate places for entry for purposes of U.S. customs laws, the Secretary chose to designate geographic areas, not physical ports. Congress should have provided guidance to immigration officers to give them criteria to consider when determining whether to designate geographic areas or physical ports. By failing to do that with § 1325(a)(1), Congress delegated away its core legislative function and violated the non-delegation doctrine. This Court must therefore dismiss.

  1. <u>The non-delegation doctrine prohibits Congress from delegating its core legislative authority, and Congress violates that prohibition if it allows an executive-branch official to decide a statute's scope without providing an "intelligible principle" to guide the official.</u>

The Constitution establishes a tripartite system of government that divides power among the three federal branches. While the branches must work together, no branch can do a task exclusively assigned to another branch. "[D]iffus[ing] power" in three separate, co-equal branches helps to "secure liberty[.]" *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring). The non-delegation doctrine protects the constitutional separation of powers by prohibiting Congress from delegating its core legislative powers to another branch. As Chief Justice Marshall explained, Congress may not "delegate . . . powers which are strictly and exclusively legislative." *Wayman v. Southard*, 10 Wheat. 1, 42–43 (1825). This protects "'the integrity and maintenance of the system of government

ordained by the Constitution.'" *Mistretta v. United States*, 488 U.S. 361, 371–72 (1989) (quoting *Field v. Clark*, 143 U.S. 649, 692 (1892)).

The prohibition against Congress delegating its core legislative function has particular salience in the criminal context. "[D]efining crimes," the Supreme Court has said, is a "legislative function," *United States v. Evans*, 333 U.S. 483, 486 (1948), and Congress cannot delegate away "the inherently legislative task" of determining what conduct "should be punished as crimes," *United States v. Kozminski*, 487 U.S. 931, 949 (1988).

Of course, Congress may "seek[] assistance, within proper limits, from its coordinate Branches." *Touby v. United States*, 500 U.S. 160, 165 (1991). "Thus, Congress does not violate the Constitution merely because it legislates in broad terms, leaving a certain degree of discretion to executive or judicial actors." *Id.* That means Congress can permit an executive-branch official to fill in the details of a legislative scheme, as long as Congress "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the authority] is directed to conform." *Mistretta*, 488 U.S. at 372 (quoting *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 406 (1928)). Put concretely, that means Congress may permissibly delegate its authority to craft the scope of laws to executive-branch officials when it provides sufficient guidance to those officials.

In 1935, the Supreme Court for the first time struck down statutes—one criminal, one civil—on non-delegation grounds. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Ref. Co. v. Ryan*, 293 U.S. 388 (1935). First, in *Panama Refining*, the Court struck down a statute authorizing the President to criminalize the interstate transportation of petroleum "produced or withdrawn" in violation of state law. 293 U.S. at 406, 414–19. Next, in *Schechter Poultry*, the Court struck down a statute authorizing the President to create a "code of fair competition" for the poultry industry. 295 U.S. at 525, 529–34. With these

statutes, Congress had failed to lay out a "legislative objective," "[p]rescribe the method of achieving that objective," and lay "down standards to guide" the exercise of executive discretion in achieving that objective. *See Yakus v. United States*, 321 U.S. 414, 423 (1944). That is, Congress had delegated authority to the President without providing an intelligible principle to guide the President.

Since *Panama Refining* and *Schechter Poultry*, Congress has generally provided an intelligible principle when enacting statutes that include delegated authority. This has avoided non-delegation problems. *See Mistretta*, 488 U.S. at 373 (citing cases). For example, in *Touby*, the Court held that Congress did not violate the non-delegation doctrine in the Controlled Substances Act. 500 U.S. at 165–66. There, the defendant argued that Congress had violated the non-delegation doctrine by allowing executive-branch officials to "schedule a drug temporarily" and then attaching criminal liability to manufacturing that substance. *Id.* 165–66. The Court held that this was a permissible delegation because Congress gave the executive-branch official sufficient guidance. *Id.* at 166. Congress, by statute, had allowed the Attorney General to schedule a drug temporarily only "'to avoid an imminent hazard to the public safety.'" *Id.* (quoting 21 U.S.C. § 811(h)(1)). Congress further listed by statute "three factors" for the Attorney General to use to make that determination. *Id.* (citing 21 U.S.C. §§ 811(c)(4)–(6), 811(h)(3)). This detailed guidance meant the statute did not violate the non-delegation doctrine. *Id.*

While the Supreme Court has not struck down a statute on non-delegation grounds since 1935, the Court gave strong indications this past term that this may change soon. In *Gundy v. United States*, 139 S. Ct. 2116 (2019), the Court addressed whether Congress violated the non-delegation doctrine in the Sex Offender Registration and Notification Act ("SORNA"). In SORNA, Congress provided that the "Attorney General shall have the authority to specify the applicability" of the Act to those convicted of sex offenses before the Act took effect. 34 U.S.C. § 20913(d). Justice Kavanaugh did not take part in the case.

A sharply divided Court upheld the delegation. The four-Justice plurality reaffirmed that Congress "may not transfer to another branch 'powers which are strictly and exclusively legislative.'" 139 S. Ct. at 2123 (quoting *Wayman*, 10 Wheat at 42–43). It held, however, that Congress had not done that in SORNA. Congress had "supplied an intelligible principle" to the Attorney General to guide his "use of discretion." *Id.* The plurality, applying the normal rules of statutory interpretation to SORNA, affirmed that Congress meant for "SORNA's registration requirements to apply to pre-Act offenders." *Id.* at 2124. The "Attorney General's role," then, was "limited": he had to "apply SORNA to pre-Act offenders as soon as he thought it feasible to do so." *Id.* at 2125–26. As a result, the plurality affirmed the defendant's conviction.

Justice Alito concurred, concluding that he could not "say that the statute lacks a discernable standard" under the Court's case law. *Id.* at 2131. He stated, however, that he might vote differently in the future with a full Court. *Id.*

Justice Gorsuch in dissent, joined by Chief Justice Roberts and Justice Thomas, disagreed with the majority about the scope of the delegated authority. *Id.* at 2131–33 (Gorsuch, J., dissenting). More generally, the dissenters believed that the Court should expand the non-delegation doctrine and that the delegation in SORNA failed that stricter standard. *See id.* at 2133–42.

*Gundy* suggests, then, that the lower courts (consistent with their role in a hierarchal judiciary) should approach with caution any government attempt to make the intelligible-principle toothless.

> 2.    The delegation of legislative authority in 8 U.S.C. § 1325(a)(1) violates the non-delegation doctrine because Congress never articulated an intelligible principle to guide how immigration officers exercise their discretion to designate times and places for entry.

As noted above, in 8 U.S.C. § 1325(a)(1), Congress has allowed executive-branch officials—"immigration officers"—the discretion to determine a criminal statute's scope. In this way, the statute is like the portion of the Controlled

Substances Act discussed in *Touby*. That statute, like this one, allowed an executive-branch official to make a decision (there, designate a substance as controlled), that altered a criminal statute's scope. *See* 500 U.S. at 165–67. Whether that delegation is permissible depends on whether Congress provided an "intelligible principle" to the executive-branch official to guide and constrain the exercise of their discretion. *Id.* at 165–66. With the Controlled Substance Act, Congress did. *Id.* at 166. With § 1325(a)(1), Congress did not.

The origin of 8 U.S.C. § 1325(a)(1) can be traced to legislation Congress passed in 1917. *United States v. Aldana*, 878 F.3d 877, 880 (9th Cir. 2017) (discussing § 1325's history). In 1917, Congress provided that non-citizens should "be taken into custody and deported" if they "have entered the United States by water at any time or place other than one designated as a port of entry for aliens by the Commissioner General of Immigration, or at any time not designated by immigration officers[.]" Immigration Act of 1917, Pub L. No. 64-301, § 19, 39 Stat. 784, 889 (cited in *Aldana*, 878 F.3d at 880).

A decade later, in 1929, Congress eliminated the distinction between land and water entries and added a criminal penalty to its 1917 prohibition. "No good reason [was] seen for perpetuating the distinction made . . . between entering by water or by land." H.R. Rep. No. 70-2418, at 4 (1929) (cited in *Aldana*, 878 F.3d at 880). Under the revised statute, Congress for the first time made it a crime for an "alien" to "enter[] the United States at any time or place other than as designated by immigration officers[.]" *Aldana*, 878 F.3d at 880 (quoting Act of Mar. 4, 1929, Pub. L. No. 70-1018, § 2, 45 Stat. 1551, 1551). Congress adopted identical language in 1952 when it enacted 8 U.S.C. § 1325(a)(1). *See* Immigration and Nationality Act, Pub. L. No. 82-414, § 275, 66 Stat. 163.

While Congress delegated to "immigration officers" the ability to define the scope of the entry offense, Congress did not provide guidance to immigration officers about what places they should designate for entry. Nothing in the text of

the 1929 legislation, nor in the legislative history, sheds any light about what Congress expected immigration officers to designate. This lack of guidance was not an oversight. Congress believed immigration officers, with help from their bureaucratic supervisors, would decide what to designate: "Immigration officers, of course, will designate times and places only as authorized by their superior officers." H.R. Rep. No. 70-2418, at 4 (1929). In other words, Congress delegated to executive-branch officials the task of developing an intelligible principle to guide the standard of other executive-branch officials.

Congress's failure to include any intelligible principle with the 1929 legislation should perhaps not be surprising. After all, the Supreme Court had not yet given teeth to the non-delegation doctrine. That would not occur until five years later. *See Panama Refining*, 293 U.S. at 406, 414–19; *A.L.A. Schechter Poultry*, 295 U.S. at 529–34. And when Congress re-codified the 1929 legislation in 1952 and enacted 8 U.S.C. § 1325(a)(1), Congress again failed to provide legislative guidance about how immigration officers should use their discretion. *See* Immigration and Nationality Act, Pub. L. No. 82-414, § 275, 66 Stat. 163. Indeed, Congress in 1952 did not change the scope of the criminal prohibition in the illegal entry statute. Instead, all it did was renumber the statute.

Immigration officers have continued to recognize their boundless discretion to designate times and places for entry. They have somewhat formalized how they exercise their discretion to designate places in 8 C.F.R. § 100.4. In that regulation, immigration officers have designated various physical ports of entry as places for entry rather than more general "geographic area[s]." *See Aldana*, 878 F.3d at 881 (discussing this regulation). "The designation" of places, however, "may be withdrawn whenever, in the judgment of the Commissioner, such action is warranted." 8 C.F.R. § 100.4(a)(a). Thus, executive-branch authorities have reserved the right to undesignate a place for entry for whatever reason a particular executive-branch official thinks is appropriate.

In any event, setting aside how immigration officers have exercised their discretion, the key point is this: Congress never gave "immigration officers" any "guidance" so that a court can determine "whether the will of Congress has been obeyed" when those officials designate times and places for entry. *See Yakus*, 321 U.S. at 426. This makes § 1325(a)(1) different from the Controlled Substance Act (upheld in *Touby*) or SORNA (upheld in *Gundy*). It instead makes the statute the same as the statutes at issue in *Panama Refining* and *A.L.A. Schechter Poultry*. *See* 293 U.S. at 406, 414–19; 295 U.S. at 529–34. As a result, Congress violated the non-delegation doctrine when it enacted § 1325(a)(1).

3.    <u>The government's contention that immigration officers had to designate physical ports of entry for purposes of § 1325(a)(1) lacks merit.</u>

In other cases raising this issue, the government has not disputed that § 1325(a)(1) constitutes a delegation of authority from the legislature to the executive branch. And the government has not purported to identify any intelligible principle that Congress laid out to guide the discretion of immigration officers. Instead, the government's primary argument seems to be that immigration officers had no choice but to designate physical ports of entry for purposes of § 1325(a)(1). *See generally* United States' Response in Opposition to Defendant's Motion to Dismiss the Indictment, *United States v. Lucas-Juarez*, 19-CR-2849 (S.D. Cal. Aug. 19, 2019). In other words, the government seems to be saying that immigration officers faced no policy choice when they chose to designate physical ports of entry and thus did not usurp any congressional authority.

As explained below, the government is just wrong. Immigration officers *did* face a policy decision in deciding what to designate: they could choose to designate physical ports facilities for entry *or* they could choose to designate geographic areas along the border for entry. They ultimately chose physical port facilities. But in making that policy choice, Congress articulated no "intelligible principle" to guide immigration officers in determining which policy to pursue. *See Mistretta*, 488 U.S.

at 372. And because Congress failed to articulate an intelligible principle, it violated the non-delegation principle.

**1.** To begin with, the Ninth Circuit has affirmed that immigration officers have designated various physical port facilities for entry for purposes of § 1325(a)(1). *Aldana*, 878 F.3d at 880–82 (citing 8 C.F.R. § 100.4(a)). They did not designate "entire geographic areas." *Id.* at 882. Thus, for example, when immigration officers designated "Alcan, AK" for entry, they designated the physical port facility in Alcan, not any particular geographic area. *See* 8 C.F.R. § 100.4(a).

That said, immigration officers did not have to designate physical port facilities. They could have chosen to designate geographic areas. In fact, it might have made more sense to. Physical port facilities open for land entry are not always literally right at the border. Indeed, in 1929, it was almost certainly the case that *most* physical ports were not right at the international border. *See*, *e.g.*, *Cheng v. INS*, 534 F.2d 1018, 1019 (2d Cir. 1976) (discussing land port of entry not right at border). Even post 9/11, some ports are still not right at the border. The "Alcan, AK" port facility, for example, is not right at the border. *See* 8 C.F.R. § 100.4(a). You must drive about a half mile into the United States before you get to the actual port facility.[2] Likewise, the "Skagway, AK" port facility is not right at the international border. *See* 8 C.F.R. § 100.4(a). It is nearly eight miles from the border, "making it the farthest offset from the border of any US land border station." *See* https://en.wikipedia.org/wiki/Skagway_-_Fraser_Border_Crossing.

By designating the physical port itself for entry, immigration officers have made it a crime for any alien—including aliens with lawful permission to be in the United States—to try to enter the United States at these ports. Take the Alcan port

---

[2] According to the U.S. Customs and Broder Protection website, the address for the Alcan port of entry is Milepost 1221.8 Alaska Highway, Alcan, Alaska, 99780. Google maps confirms that the port facility is about .5 mile north on Highway 2 from the international border.

facility. As just noted, you must drive about a half mile into the United States to arrive at the physical port. If you are a legal permanent resident ("LPR")—that is, if you are an "alien"—you cannot enter at this port facility without violating § 1325(a)(1). When you cross from Canada into the United States, you will have entered the United States at a non-designated place, since that geographic area is not designated, only the physical port facility a half mile inland will be designated. Immigration officers could have avoided that by designating the geographic area surrounding the physical port for entry. In that case, the LPR would not have violated § 1325(a)(1). And the LPR would commit no crime as long as he or she went promptly to the port facility. On the other hand, if the LPR did *not* go to the port of entry and receive an immigration inspection, the LPR would have violated 8 U.S.C. § 1325(a)(2) by eluding an immigration inspection. *See United States v. Corrales-Vazquez*, 931 F.3d 944, 947–53 (9th Cir. 2019). But, for reasons that are not clear, immigration officers have chosen not to designate geographic areas.

**2.** How the Secretary of Treasury has used his discretion to designate places for entry for purposes of customs law confirms that immigration officers could have designated geographic areas for entry for purposes of immigration law.

Under 19 U.S.C. § 1459(a), Congress has made it a crime for anyone—including a U.S. citizen—to "enter the United States" outside a "border crossing point designated by the Secretary," without immediately presenting themselves "for inspection" at the "customs facility designated for that crossing point[.]" The referenced "Secretary" is the Secretary of Treasury. 19 U.S.C. § 1401(l). The Secretary of Treasury, unlike immigration officers, has designated geographic regions for entry, not physical port facilities. *See* 19 C.F.R. § 101.3 (listing the customs port facilities).

For example, one listed area is "San Diego." 19 C.F.R. § 101.3(b)(1). The Secretary defined it as a geographic area. *See* Change in the Customs Service Field Organization; San Diego, CA, 50 Fed. Reg. 4504-01 (Jan. 21, 1985) (providing the

precise geographic boundaries of the "port of San Diego" by reference to various highways, the Pacific Ocean, and the international border). Indeed, the regulation listing out the "limits" of the customs ports of entry—19 C.F.R. § 101.3— references documents that lay out the precise geographic boundaries of various ports. Thus, while a non-citizen would violate § 1325(a)(1) by travelling to the Alcan port facility, that same individual would not violate customs law. For purposes of customs law, the Secretary has defined the Alcan port as the geographic area surrounding the physical port facility. *See* Alcan, Alaska; Port of Entry, 36 Fed. Reg. 15114 (Aug. 13, 1971) (expanding the "geographical limits of the port at Alcan [to] include all the area within the boundaries of sec. 25, Tp. 10 N., Ra. 23 E. of the Copper River Meridian, in the State of Alaska").

Indeed, it is worth noting, that while immigration officials have currently designated physical ports for entry, *see Aldana*, 878 F.3d at 880–82, that is not always the case. For example, in 1944, the Board of Immigration Appeals addressed whether a non-citizen who crossed into the United States within the city limits of Calexico, California had entered at a non-designated place and could be deported on that basis. *Matter of V-T-*, 2 I. & N. Dec. 213, 214 (BIA 1944). The Board held that, when an "alien enters within the limits of a city that is a designated port of entry but at a point other than where the immigration office is located, the applicable charge is entry without inspection, not entry at other than a designated port." *Id.* at 214 (citing *Matter of O-*,1 I. & N. Dec. 617 (BIA 1943)). Thus, the Board confirmed that the city itself had been designated for entry, not just the physical port facility. Indeed, the U.S. Citizenship and Immigration Service has *repeatedly* stated in numerous appellate decisions that, "[w]hen an alien enters the United States within the limits of a city designated as a port of entry, but at a point where immigration officers are not located, the applicable charge is entry without

inspection," rather than entering at a non-designated place.[3] This merely confirms that immigration authorities can, if they choose, designate physical places (including cities) as designated places for entry.

**3.** This is not to say that immigration officers erred by designing physical ports. Instead, the point is that they had a policy choice to make: designate physical ports or designate geographic areas. *And in making that choice, immigration officers were not guided by Congress.* Indeed, the fact that the Secretary of Treasury and immigration officers both received essentially the same delegation of authority and exercised that delegated authority differently underscores that Congress did not provide guidance. That is, Congress did not give guidance as to why they might want to choose one regime over another. There was no "intelligible principle." *See Mistretta*, 488 U.S. at 372. Thus, Congress violated the non-delegation principle when it enacted § 1325(a)(1).

\* \* \*

In short, while the Supreme Court might soon expand the non-delegation doctrine's reach, § 1325(a)(1) violates even the more modest version of the doctrine. Thus, the charged statute is unconstitutional. This Court, then, must dismiss.

### D. Congress violated the Due Process Clause's prohibition on vague laws when it enacted 8 U.S.C. § 1325(a)(1), and this Court must therefore dismiss.

The government violates the Fifth Amendment's Due Process Clause "by

---

[3] *See, e.g.*, U.S. Dep't of Homeland Sec., Application for Permanent Residence, 2005 WL 2101371, at *1 (Jan. 13, 2005); U.S. Dep't of Homeland Sec., Application for Permanent Residence, 2004 WL 3457039, at *1 (Oct. 21, 2004); U.S. Dep't of Homeland Sec., Application for Permanent Residence, 2004 WL 3456018, at *1 (Feb. 11, 2004); U.S. Dep't of Homeland Sec., Application for Permanent Residence, 2004 WL 3455973, at *1 (Feb. 6, 2004); U.S. Dep't of Homeland Sec., Application for Permanent Residence, 2004 WL 3455975, at *2 (Feb. 6, 2004); U.S. Dep't of Homeland Sec., Application for Permanent Residence, 2004 WL 3455977, at *2 (Feb. 6, 2004); U.S. Dep't of Homeland Sec., Application for Permanent Residence, 1998 WL 1990186, at *2 (March 9, 1998); U.S. Dep't of Homeland Sec., Application for Permanent Residence, 1998 WL 1990188, at *2 (March 9, 1998).

taking way someone's life, liberty, or property" based on a "vague" criminal law. *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015). "A statute can be impermissibly vague for either of two independent reasons." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). First, a statute is impermissibly vague if it "fails to give ordinary people fair notice of conduct it punishes[.]" *Johnson*, 135 S. Ct. at 2556. Second, a statute is impermissibly vague if it "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill*, 530 U.S. at 732. The vagueness "doctrine guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018). Here, § 1325(a)(1) flunks these requirements. The charged statute, then, is unconstitutionally vague. This Court must therefore dismiss.

As explained above, the scheme Congress and executive-branch officials created in § 1325(a)(1) permits an immigration officer, including a Border Patrol agent, to decide what places and times to designate for entry. An immigration officer can decide what to designate for any reason or no reason at all. There are no "standards to govern the actions of" immigration officers. *See Dimaya*, 138 S. Ct. at 1212. It is up to the officer's whim. Thus, the statute, and the implementing regulation, "authorize[] . . . arbitrary and discriminatory" enforcement. *See Hill*, 530 U.S. at 732.

Moreover, and particularly problematic, is that immigration officers can alter what is designated for entry without a moment's notice. As noted above, the regulation itself designating places provides the caveat that the "designation" of places "may be withdrawn whenever, in the judgment of the Commissioner, such action is warranted." 8 C.F.R. § 100.4(a). And immigration officers use this power. For example, at times immigration officers will shut down ports of entry without

1  notice.[4] Thus, from one moment to the next, the same conduct can be lawful or
2  criminal. Indeed, when the government shuts down a port without notice, this has
3  the effect of turning every single non-citizen in line waiting to get into the United
4  States at that port into a criminal: they are each attempting enter the United States
5  at a place that (unknown to them) is no longer designated for entry.

6      In this way, the statute resembles the vagrancy law the Supreme Court held
7  was unconstitutionally vague in *Papachristou v. Jacksonville*, 405 U.S. 156, 162–
8  170 (1972). In striking down a statute that criminalized loitering and disorderly
9  conduct, the Court observed the statute's vague terms effectively gave "unfettered
10  discretion" to law enforcement. *Id.* at 168. When a scheme lacks any "standards
11  governing the exercise of . . . discretion," "the scheme permits and encourages an
12  arbitrary and discriminatory enforcement of the law." *Id.* at 170. Likewise, here,
13  Congress has given "unfettered discretion" to federal law enforcement officials to
14  define a criminal statute's scope, thereby "permit[ting] . . . an arbitrary and
15  discriminatory enforcement of the law." *See id.*

16      Nor does it matter if this Court thinks § 1325(a)(1) is not unconstitutionally
17  vague as applied in this case. The point is that the law, on its face, *permits* arbitrary
18  enforcement. That alone means the law is unconstitutionally vague. *See Hill*, 530
19  U.S. at 732. Indeed, "[w]hen vagueness permeates the text of . . . a law, it is subject
20  to facial attack." *Chicago v. Morales,* 527 U.S. 41, 55 (1991) (plurality opinion)
21  (footnote omitted). That's because "[i]n our constitutional order, a vague law is no
22  law at all." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019). In fact, in *Johnson*,
23  the Court held that the law at issue was unconstitutionally vague, even though there
24  was "conduct that clearly f[e]ll within the provision's grasp." 135 S. Ct. at 2560–
25

26  [4]      *See,   e.g.,*   https://www.cnn.com/2019/07/01/us/el-paso-border-protests-
27  shutdown/index.html (noting port officials shut down a port of entry in El Paso
   without   notice);   https://ktla.com/2019/04/01/as-trump-threatens-to-close-border-
28  experts-warn-of-billions-in-economic-damage/ (discussing an instance when port
   authorities shut down the San Ysidro port of entry).

61.

Finally, the government might complain that the crime of entering at a non-designated place has been around for a long while and no court has held it is unconstitutionally vague. But no court has *addressed* whether the law is vague. Moreover, the age of a statutory phrase does not save it from a successful vagueness challenge. For example, the Supreme Court in *Morales* struck down an anti-loitering law, *see* 527 U.S. at 60–64, even though laws prohibiting loitering have been around "since before the Constitution was ratified," *see Johnson*, 135 S. Ct. at 2566–67 (Thomas, J, concurring). Indeed, over the past few years, the Supreme Court in cases like *Davis*, *Dimaya*, and *Johnson* has re-affirmed the importance of the void-for-vagueness doctrine to our government's constitutional structure.

In short, § 1325(a)(1) violates the prohibition against vague laws. Thus, the charged statute is unconstitutional. This Court, then, must dismiss.

### E.   The Court Should Dismiss the Complaint because this prosecution violates equal protection.

Federal law contains three classes of misdemeanors. A Class A misdemeanor is an offense punishable by "one year or less but more than six months." 18 U.S.C. § 3559(a)(6). A Class B misdemeanor is punishable by "six months or less but more than thirty days." 18 U.S.C. § 3559(a)(7). And a Class C misdemeanor is punishable by "thirty days or less but more than five days." 18 U.S.C. § 3559(a)(8). Federal law categorizes Class B and Class C misdemeanors as "petty offenses." 18 U.S.C. § 19. So illegal entry under § 1325, which is a Class B misdemeanor, is a "petty offense."

Every year, the Government prosecutes thousands of petty offenses in the Southern District of California through the Central Violations Bureau ("CVB"). According to its website, offenses prosecuted through CVB include violations of "certain federal laws" as well as violations of certain state laws that occur on federal property under the Assimilative Crimes Act at 18 U.S.C. § 13. *See* Exhibit F.

Offenses that appear in the Code of Federal Regulations that have a maximum sentence of six months or more are also frequently prosecuted through CVB.

But more serious crimes—including some felonies—are also prosecuted in CVB court. These crimes include unlawful possession of a firearm (18 U.S.C. § 922(g)), assault on a federal officer (18 U.S.C. § 111), identity theft (18 U.S.C. § 1028), interstate domestic violence (18 U.S.C. § 2262), theft of government property (18 U.S.C. § 641), and possession of weapons or firearms in a federal facility (18 U.S.C. § 930). In fact, between July 2018 and July 2019—during the same period that Streamline has been in effect—the Government has charged at least 383 defendants in CVB court with Title 18 and Title 21 offenses that are class B misdemeanors or higher.[5]

Even though these 383 defendants prosecuted in CVB court were charged with equally serious (or more serious) crimes than § 1325, none were held in criminal custody. *See* Ex. I. Rather, at the time of apprehension, everyone was released with a citation. Occasionally, a person may be briefly handcuffed or held for questioning by law enforcement officials for several hours. *Id.* But even in these rare cases, the person is released the same day. *Id.*

Several weeks later, a defendant in CVB court will receive a notice to appear in the mail instructing him or her to appear at one of the upcoming misdemeanor courts. *Id.* This court proceeding does not take place in a courtroom and is not presided over by a judge. Rather, it is held in one of the jury rooms of the federal courthouse, where the defendants freely come and go throughout the morning. Each defendant will meet with his or her defense attorney, after which the defense

---

[5] Hundreds of other defendants were charged with offenses that would be a felony under California law and so are punishable as a felony under the Assimilative Crimes Act. *See* 18 U.S.C. § 13 (stating that a person who "would be punishable" under state law "shall be guilty of a like offense and subject to a like punishment" under the Assimilative Crimes Act).

attorney will attempt to negotiate a disposition with the prosecutor. At a later date, the magistrate judge will then review and approves this disposition.

Nearly all the offenses in CVB court will eventually be dismissed or resolved through a fine or a deferred prosecution agreement. For instance, of the 383 cases charged under Titles 18 and 21 of the United States Code in CVB court last year, 98.6% were dismissed and 1.4% were resolved through forfeiture of collateral. Not a single one resulted in a conviction.

But the Government does not place individuals accused of § 1325 in CVB court. They are not released into the community on the day of their arrest. They are not allowed to remain out of custody to await the written notice of their charges. They are always shackled when meeting with their attorneys (and sometimes in court). They are not offered any deferred prosecution options. And while 100% of defendants convicted of § 1325 are punished with at least *some* custodial time, none of these 383 CVB defendants last year received *any* jail time.

These disparities do not exist because of the level of severity of the offense. The 383 Title 18 and 21 crimes the Government charged in CVB court last year carried penalties *as* serious or *more* serious than § 1325. Nor do these disparities exist because § 1325 defendants are less likely to show up for court. In the year since Streamline court began on July 9, 2018, Pretrial Services and various magistrate judges in the Southern District of California have reported that 79 of the 299 § 1325 defendants released on bond into the community have failed to appear for court—an in absentia rate of 26.4%. *See* Ex. H. But of the 383 CVB defendants charged with federal offenses last year, 134 did not show up for court—an in absentia rate of 35%. *See* Exhibit H, CBP Chart 2018-19. In other words, § 1325 defendants are nearly 8.6% *more* likely to show up for court than CVB defendants.[6]

---

[6] Nor are Border Patrol officers precluded from issuing CVB citations—for instance, one citation shows that a person in the pedestrian lane at the San Ysidro port of entry was prosecuted for being a possession of firearm by a prohibited

In sum, by prosecuting § 1325 defendants in "regular court," the Government does not permit them to take advantage of the substantial benefits of CVB court, even though § 1325 defendants are charged with a similar or less serious offense than defendants charged in CVB court and pose less risk of flight. Accordingly, the Government discriminates against § 1325 defendants as compared to other individuals charged with petty offenses in the Southern District of California.

The Fourteenth Amendment provides that states shall not "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV. This guarantee of equal protection also extends to the federal government. *See United States v. Windsor*, 570 U.S. 744, 774 (2013) ("The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws."). While the government retains broad discretion to classify individuals where it is reasonable to do so, classifications based on alienage, national origin, and race are "inherently suspect and subject to close judicial scrutiny." *Graham v. Richardson*, 403 U.S. 365, 371-72 (1971). This is because "[a]liens as a class are a prime example of a discrete and insular minority for whom such heightened judicial solicitude is appropriate." *Id.* at 372 (quotations and citation omitted). To survive strict scrutiny, disparate treatment on the basis of alienage, national origin, or race must be compelling and narrowly tailored to achieve its objective, and there can be no less discriminatory means of achieving the goal. *See, e.g., Grutter v. Bollinger*, 539 U.S. 306, 326 (2003).

---

possessor under 18 U.S.C. § 922—an offense carrying a potential *life sentence* depending on the accused's priors. *See* Exhibit O, § 922 Citation. Another person prosecuted in CVB court was apprehended at a port of entry while possessing a full syringe of black tar heroin. So Border Patrol officers can and do issue CVB citations for serious offenses at or near the border.

MR. RUIZ'S MOTIONS TO DISMISS THE COMPLAINT

Here, that high standard is not met. Defendants in the Southern District of California who are charged with petty offenses *other than* § 1325 are not held in pre-trial custody, are not subject to shackling, are not limited in their ability to consult counsel, are not prevented from seeking alternative dispositions, and are not punished by incarceration. Meanwhile, defendants charged with § 1325 are, by definition, set apart on the basis of their alienage,[7] as well as by their national origin and race. In other words, by making § 1325 defendants the only petty offenders subject to pretrial incarceration and shackling, convictions, and jail sentences, the Government is not simply prosecuting illegal entrants for a crime—it is punishing them more severely than similarly-situated defendants on the basis of their alienage, national origin, and race.

Even if § 1325's *facial* elements did not trigger strict scrutiny, the Supreme Court has held that facially-neutral government action motivated by "invidious racial discrimination" violates equal protection. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). And within the past year, numerous courts have recognized that comments made by President Trump both before and after he took office create a plausible equal protection violation on the basis of discrimination against Mexicans and Central Americans. For example, courts have relied on the following statements to find animus on the basis of race and national origin:

- In discussing protections for nationals from Latin America (including El Salvador), the president asked, "'Why are we having all these people from shithole countries come here?'" and expressed a

---

[7] The Government may argue that its charging practices do not discriminate on the basis of alienage but rather on the basis that § 1325 defendants are undocumented, which is not a protected class and thus not subject to strict scrutiny. *See, e.g.*, But this argument fails because a defendant may be convicted under § 1325 even though she has legal status. *See, e.g., United States v. Sanchez*, 258 F. Supp. 2d 650, 662 (S.D. Tex. 2003) (holding that a lawful permanent resident may be convicted of § 1325); *United States v. Figueroa–Corrales*, 845 F.2d 329 (9th Cir. 1988) (unpublished); *Gunaydin v. United States Immigration and Naturalization Serv.*, 742 F.2d 776 (3d Cir. 1984).

preference for immigrants from countries like Norway, which is overwhelmingly white;[8]

- The president "spoke publicly about the need to protect 'the West' and 'civilization' from forces from 'the South or the East'";[9]

- The president has described Mexicans and Central Americans as "gang members, killers, and rapists"; "'criminals' and 'thugs'"; "'bad hombres'"; and "true animals";[10]

- The president stated that Judge Gonzalo Curiel could not be fair in presiding over a lawsuit because he was "'of Mexican heritage,' 'Hispanic,' and a member of a Latino Lawyers' Association";[11]

- Referring to an article about a recent crime wave on Long Island, the president said "'They come from Central America. They're tougher than any people you've ever    met . . . . They're killing and raping everybody out there'";[12]

- Referring to immigrants, the president stated, "'You know they're bad. They're pouring in from El Salvador, Guatemala, Honduras, Mexico, all over. They're just pouring into our country!'";[13]

- In May 2018 (immediately before the zero-tolerance policy began), the president said of people crossing the Mexican border into the United States: 'You wouldn't believe how bad these people are. These aren't people. These are animals.'"[14]

Citing such statements, one court observed: "One could hardly find more direct

---

[8] *Ramos v. Nielson*, 321 F. Supp. 3d 1083, 1099-100 (N.D. Cal. 2018); *S.A. v. Trump*, 363 F. Supp. 3d 1048, 1060-61 (N.D. Cal. 2018); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 315 (D. Md. 2018).

[9] *CASA de Maryland*, 355 F. Supp. 3d at 315.

[10] *S.A.*, 363 F. Supp. 3d at 1059; *CASA de Maryland*, 355 F. Supp. 3d at 325; *Centro Presente v. United States Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 401 (D. Mass. 2018); *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 276-77 (E.D.N.Y. 2018).

[11] *CASA de Maryland*, 355 F. Supp. 3d at 315; *S.A.*, 363 F. Supp. 3d at 1059; *Batalla Vidal*, 291 F. Supp. 3d at 276–77.

[12] *S.A.*, 363 F. Supp. 3d at 1059; *Centro Presente*, 332 F. Supp. 3d at 401.

[13] *S.A.*, 363 F. Supp. 3d at 1060.

[14] *S.A.*, 363 F. Supp. 3d at 1061.

evidence of discriminatory intent towards Latino immigrants." *CASA de Maryland*, 355 F. Supp. 3d at 325.

Here, the abrupt decision in April 2018 to begin prosecuting § 1325 misdemeanors in the Southern District of California at record levels almost certainly originated from this hostility. *See* Exs. L, M, N. And even though local prosecutors may have had no intent to discriminate on the basis of race or national origin, "their actions may violate the equal protection guarantee if President Trump's alleged animus influenced or manipulated their decision making process." *Ramos*, 321 F. Supp. 3d at 1123. *See also CASA de Maryland*, 355 F. Supp. 3d at 325 (finding that the president's racial animus against El Salvadorans could be imputed to a subordinate because "[a]n action is not cured of discriminatory taint because it is taken by an unprejudiced decision-maker who is manipulated or controlled by another who is motivated by discriminatory intent"); *Centro Presente v. United States Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 415 (D. Mass. 2018) (ascribing the president's "anti-Latino animus" to those "involved in the decision-making process"). So even assuming that no local prosecutors were motivated by race or national origin, President Trump's demonstrated animus towards people from Mexico and Central America requires strict scrutiny.[15] And because the government cannot show that its decision to prosecute this case in regular court, rather than CVB court, satisfies strict scrutiny, the Court should dismiss.

---

[15] Even if strict scrutiny did not apply, the Ninth Circuit has held that a "dogged animus" against a disfavored group cannot satisfy rational-basis review because "such animus cannot constitute a legitimate state interest." *Arizona Dream Act Coal.*, 855 F.3d at 970. *See also Romer v. Evans*, 517 U.S. 620, 634 (1996) (holding that government action cannot survive rational-basis review where there exists "the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected").

### F.   The Court Should dismiss because the prosecution violates principles of selective prosecution and selective enforcement.

Alternatively, the Court could also adjudicate this equal protection challenge through the legal framework of a selective prosecution or selective enforcement claim. *See United States v. Armstrong*, 517 U.S. 456, 464–65 (1996) (grounding selective prosecution claims in "the equal protection component of the Due Process Clause of the Fifth Amendment"). Although § 1325 defendants and CVB defendants are both technically being "prosecuted" for a crime, courts may consider whether the government is relying on impermissible grounds to prosecute similarly-situated defendants in different systems. *See, e.g.*, *United States v. Sellers*, 906 F.3d 848, 853 (9th Cir. 2018) (stating that "the demographics of those prosecuted in state and federal courts for the same crime" may "evince differential treatment of similarly situated individuals") (citing *Armstrong*, 517 U.S. at 466–67, 470); .

"To establish a claim of selective prosecution, a defendant must show both discriminatory effect and discriminatory purpose." *Id*. at 852. Courts apply a "rigorous standard" to such claims because "[p]rosecutors occupy a special province of the executive branch and have broad discretion to enforce our nation's laws." *Id*. at 853 (quotations omitted). But a prosecutor's discretion is still "subject to constitutional constraints," including equal protection. *United States v. Batchelder,* 442 U.S. 114, 125 (1979). So prosecutorial decisions may not be based on "an unjustifiable standard such as race, religion, or other arbitrary classification." *Oyler v. Boles,* 368 U.S. 448, 456 (1962). *See also Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995) (adjudicating a selective prosecution claim on the basis of national origin). Thus, a defendant can succeed on a selective prosecution claim by showing that the administration of a criminal law is "directed so exclusively against a particular class of persons ... with a mind so unequal and oppressive" that the system of prosecution amounts to "a practical

denial" of equal protection of the law. *Yick Wo v. Hopkins,* 118 U.S. 356, 373 (1886).

Here, the government's disparate treatment of § 1325 defendants has a "discriminatory effect." As explained above, the U.S. Attorney's office in the Southern District of California prosecutes people who are of a different alienage, national origin, and race in a separate system than "similarly situated individuals" charged with equivalent crimes. Because of its decision to file criminal complaints in some cases and CVB citations in other cases, one set of defendants is not arrested, does not serve jail time, and rarely ends up with a conviction, while the other does. As explained above, this disparate treatment also has a discriminatory purpose, given President Trump's history of disparaging comments about immigrants and people from Mexico and Central America.[16] So the government's policy of prosecuting everyone *except* § 1325 defendants in CVB court violates equal protection under the doctrine of selective prosecution.

Alternatively, this policy violates equal protection under the doctrine of selective enforcement. To show selective enforcement, a party is generally required to show that law enforcement officers are enforcing an "unconstitutional policy" by "extrapolating from a series of enforcement actions." *Hoye v. City of Oakland*, 653 F.3d 835, 855 (9th Cir. 2011). *See also Thomas v. County of Los Angeles*, 978 F.2d 504, 509 (9th Cir. 1993) (selective enforcement requires the showing of a "policy, plan, or a pervasive pattern"). But because law enforcement officers do not enjoy the "same presumption of regularity and deference" as prosecutors, a claim of

---

[16] Arguably, there is no need to even show a discriminatory purpose because § 1325, on its face, has an element of alienage, which is a protected class subject to strict scrutiny. *See Wayte v. United States*, 470 U.S. 598, 610 n.10 (1985) ("A showing of discriminatory intent is not necessary when the equal protection claim is based on an overtly discriminatory classification.").

selective enforcement need not satisfy "as rigorous a standard" as a claim of selective prosecution. *Sellers*, 906 F.3d at 853.

Here, there is unquestionably a "policy, plan, or a pervasive pattern" of federal law enforcement officers in the Southern District of California treating petty offenders differently based on their alienage, national origin, and race. Individuals who commit § 1325 are arrested, detained in horrific conditions, offered no alternative disposition, and sentenced to jail time. But individuals who commit any federal petty offense *other* than § 1325 are released, sent a citation, told to show up to "traffic court," usually offered a fine or other alternative disposition, and rarely sentenced to jail. For these reasons, the arrest and prosecution in this case violates the doctrines of selective enforcement and selective prosecution.

### G.    This prosecution violates procedural and substantive due process.

The Due Process Clause of the Fifth Amendment also guarantees that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. This Clause protects individuals in two ways. Substantive due process "prevents the government from engaging in conduct that shocks the conscience" or "interferes with rights implicit in the concept of ordered liberty." *United States v. Salerno*, 481 U.S. 739, 746 (1987) (quotations and citations omitted). But when government action survives substantive due process scrutiny, it must still be implemented in a fair manner under the doctrine of procedural due process. *See Mathews v. Eldridge*, 424 U.S. 319 (1976). To determine whether governmental action satisfies procedural due process, courts employ a three-factor test that weighs (1) the interest at stake for the individual, (2) the risk of erroneous deprivation of such interest and the probable value of safeguards, and (3) the costs and administrative burden on the Government. *Id.* at 335.

Streamline court survives neither analysis. First, substantive due process has been violated because it "shocks the conscience" for the Government to blatantly deprive § 1325 defendants of the substantial benefits of CVB court while extending

those benefits to defendants charged with similar or *more* serious crimes who have a similar or *greater* risk of flight.

But even if this deprivation survived substantive due process, it could not survive procedural due process under the *Mathews v. Eldridge* factors. First, the interest at stake for the individual is substantial, as defendants charged with § 1325 face a significant loss of liberty, the traumatizing experience of being held in custody in substandard conditions, and an overwhelmingly greater chance of being convicted of an offense. Second, there is no question that charging § 1325 defendants in CVB court would almost entirely alleviate the risk that they would be held in custody, subject to horrendous conditions, and convicted of an offense. Finally, the costs and administrative burden on the Government are minimal, as nothing suggests that absorbing Streamline defendants into CVB proceedings would be problematic, or that there would be a greater than average risk of absconding. And if anything, placing § 1325 defendants in CVB court would greatly *lessen* the burden on the Government to provide housing, food, and transportation during the criminal proceedings. Thus, the Government's discriminatory treatment violates both substantive and procedural due process under the *Mathews v. Eldridge* factors.

## IV.   CONCLUSION

For these reasons, Mr. Ruiz respectfully requests the Court grant his motion to dismiss the complaint.

Respectfully submitted,

Dated:  March 11, 2020          *s/ Chandra L. Peterson*
Federal Defenders of San Diego, Inc.
Attorneys for Mr. Ruiz
Email:  Chandra_Peterson@fd.org