ROBERT S. BREWER, JR.
United States Attorney
COLIN M. MCDONALD
California Bar No. 286561
NICHOLAS J. HERNANDEZ
New York Bar No. 5185277
Assistant United States Attorneys
United States Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101
(619) 546-9144/7029
Colin.McDonald@usdoj.gov

Attorneys for the United States of America

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>J. INES RUIZ-RIVERA,<br><br>Defendant. | Case No.: 20-MJ-20306-AHG<br><br>UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTIONS AT ECF NO. 42. |

The United States, through its counsel, hereby responds to Defendant's motions filed at ECF No. 42. The motions should be denied entirely. With respect to Defendant's equal protection claim, Defendant is not charged with any law enacted in the 1920's; he is charged with attempted entry, a crime first enacted by Congress in 1990. This, alone, disposes of Defendant's motion and renders his claim—seeking an advisory opinion of the constitutionality of an uncharged crime—non-justiciable. But even on the merits, the equal protection claim fails. Congressional decisionmaking in immigration affairs—where Congress has plenary power—is subject to a highly deferential standard of review. The illegal entry law, seeking to deter illegal immigration, easily passes that low standard.

As to the other motions, Defendant requests that the Court enjoin immigration officers from effectuating his arrest at the federal courthouse following the conclusion of

1   his criminal case. Among other flaws, Defendant's request is well beyond the scope of this

2   criminal prosecution—the Court has no jurisdiction to enter an order enjoining speculative

3   post-judgment actions of a non-party to this action. As his motion makes clear, the proper

4   forum for Defendant's requested relief, if any, is an affirmative civil lawsuit against the

5   prospective arresting agency. Defendant's motion should be denied in all respects,

6   including his request for a stay.

I

FACTUAL BACKGROUND

On February 4, 2020, Border Patrol found Defendant hiding in a corner of a community center in Jacumba, California, just two hundred yards north of the United States/Mexico international boundary. Defendant admitted he was a citizen of Mexico with no documents permitting him to enter the United States. He was arrested. Post-*Miranda*, Defendant admitted illegally entering the United States on February 4. ECF No. 1. On February 5, 2020, Defendant was charged with attempted illegal entry in violation of 8 U.S.C. § 1325(a)(1).

On June 18, 2020, after a motion hearing, the Court set trial for August 5. On July 22, 2020, Defendant filed the initial versions of the instant motions. The Court struck those motions from the record as "excessive." ECF No. 41. The Court extended leave for Defendant to refile the motions in accordance with limitations imposed by the local rules by July 27, 2020. *Id.* Defendant re-filed the instant motions on that date. The United States now responds.

II

RESPONSE IN OPPOSITION TO

DEFENDANT'S MOTION TO DISMISS

A.   *Statutory Background*

In the Immigration Act of 1917, Congress passed legislation requiring deportation of aliens who entered the United States "at any time or place other than as designated by immigration officials, . . . or who enter[ed] without inspection." Immigration Act of 1917,

Pub. L. No. 64-301, § 19, 39 Stat. 874, 889. To enhance the deterrent value of this statute, the 70th Congress made unlawful entry a misdemeanor offense in 1929. *See* Act of Mar. 4, 1929, Pub. L. No. 70-1018, § 2.[1] As the House Committee Report stated, "it is believed that if the class of aliens who are endeavoring to enter the United States surreptitiously become aware that when detected they will be fined and imprisoned, as well as deported, the number who attempt to smuggle themselves or have themselves smuggled into the United States will be materially lessened." H.R. Rep. No. 2418 at 7. This Act did not include an attempted entry crime – the crime Defendant is charged with.

Over twenty years later, in 1952, the 82nd Congress passed the Immigration and Nationality Act ("INA"), an act designed to "revise the laws relating to immigration, naturalization, and nationality" in the United States. *See* Pub. L. No. 82-414, 66 Stat. 163 (introduction). In this renewed and comprehensive legislation (codified at 8 U.S.C. § 1 et seq.), Congress included the following misdemeanor and (for the first time) felony provision for illegal entry:

> Any alien who (1) enters the United States at any time or place other than as designated by immigration officers, or (2) eludes examination or inspection by immigration officers, or (3) obtains entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact, shall, for the first commission of any such offenses, be guilty of a misdemeanor and upon conviction thereof be punished by imprisonment for not more than six months, or by a fine of not more than $500, or by both, and for a subsequent commission of any such offenses shall be guilty of a felony and upon conviction thereof shall be punished by imprisonment for not more than two years, or by a fine of not more than $1,000, or both.

*Id.* at § 275, 66 Stat. 229 (8 U.S.C. § 1325). Again, there was no provision for attempted entry – the crime Defendant is charged with.

---

[1]     The text stated, "Any alien who hereafter enters the United States at any time or place other than as designated by immigration officials or eludes examination or inspection by immigration officials, or obtains entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact, shall be guilty of a misdemeanor." *Id.*

Nearly 40 years later, in the Immigration Act of 1990, the 101st Congress amended 8 U.S.C. § 1325 to add attempted entry for the first time to the list of crimes codified in Section 1325. *See* Pub. L. No. 101-649, § 543(b)(2), 104 Stat. 5059. The Immigration Act of 1990 was sponsored by Senator Edward Kennedy and easily passed by Congress.[2]

## B.   *Defendant Contests the Constitutionality of an Uncharged Crime*

Defendant contends the illegal entry law is unconstitutional because of alleged racial animus when illegal entry was first criminalized in the 1920's. For various reasons set forth below, this claim fails. But there is a preliminary point which is fatal to Defendant's motion. Defendant is not charged with any law enacted in the 1920's; Defendant is charged with *attempted* entry under 8 U.S.C. § 1325(a)(1). *See* ECF No. 1. As indicated above, attempted entry first became a crime just 30 years ago, in the Immigration Act of 1990. Defendant offers no reason to believe that the attempted entry crime violates the constitution.[3] He does not even address the issue. This fact is dispositive of Defendant's motion.

## C.   *Defendant's Claim is Not Justiciable*

The same fact also raises an insurmountable justiciability issue. Pursuant to Article III of the U.S. Constitution, federal courts can only adjudicate live cases or controversies. The court's "role is neither to issue advisory opinions nor to declare rights in hypothetical cases, but to adjudicate live cases or controversies consistent with the powers granted the judiciary in Article III of the Constitution." *Thomas v. Anchorage Equal Rights Commission*, 220 F.3d 1134 (9th Cir. 2000) (en banc). "Ripeness is an Article III doctrine designed to ensure that courts adjudicate live cases or controversies and do not issue

---

[2]   *See, e.g.,*
https://www.senate.gov/legislative/LIS/roll_call_lists/roll_call_vote_cfm.cfm?congress=101&session=2&vote=00323 (89 senators voted in favor);
https://www.congress.gov/bill/101st-congress/senate-bill/358.

[3]   At best, Defendant may seek to weld the congressional decisions made in the Immigration Act of 1990 to the Undesirable Aliens Act of 1929. That sort of attenuated constitutional inquiry—particularly where the actual charged crime was not present in the original bill—is not countenanced by any authority.

4

advisory opinions [or] declare rights in hypothetical cases." *Bishop Paiute Tribe v. Inyo Cty.*, 863 F.3d 1144, 1153 (9th Cir. 2017). Here, Defendant invites the Court to adjudicate the constitutionality of a crime which is not even charged. That would be a quintessential advisory opinion. The Court should decline to render one.

### D. *Defendant Fails to Establish an Equal Protection Violation*

In the event the Court reaches Defendant's equal protection claim, the claim should be rejected. Defendant overlooks that immigration laws passed by Congress are subject to a highly deferential standard of review. With the proper standard in view—requiring Defendant, for instance, to negate "every conceivable basis which might support" the illegal-entry law—Defendant's claims fail.

#### 1. *Congress's Immigration Laws Are Subject to Deferential, Rational-Basis Review*

For more than a century, "it has been universally recognized that Congress possesses authority over immigration policy as an incident of sovereignty." *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1076 (9th Cir. 1998). The Supreme Court has called Congress's inherent immigration power "plenary"; the Ninth Circuit has deemed it "sweeping." *Id.* (citing *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972) and *Catholic Social Servs. v. Reno*, 134 F.3d 921, 927 (9th Cir. 1998)). "Whatever the label, all agree that 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Id.* (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977). Given Congress's expansive authority over immigration affairs, its actions in this area are "largely immune from judicial control," *Fiallo*, 430 U.S. at 792, subject only to "narrow judicial review." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 102 n.21 (1976). Indeed, "the reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization." *Fiallo*, 430 U.S. at 796 (citing *Mathews v. Diaz*, 426 U.S. 67, 82 (1976); *see also id.* at 792 ("[I]t is important to underscore the limited scope of judicial

inquiry into immigration legislation."); *Trump v. Hawaii*, 138 S. Ct. 2392, 2419 (2018) ("deferential standard of review" applies in immigration context).

According to Supreme Court jurisprudence, this "deferential standard of review" is limited to considering whether the law is "facially legitimate and bona fide." *Mandel*, 408 U.S. at 769. In *Mandel*, the Attorney General denied admission to a Belgian journalist and self-described "revolutionary Marxist" who had been invited to speak at a conference at Stanford University. 408 U.S., at 756-57. The professors who wished to hear Mandel speak challenged that decision under the First Amendment, and the Supreme Court acknowledged that their constitutional "right to receive information" was implicated. *Id.* at 764-65. But the Court limited its review to whether the Executive gave a "facially legitimate and bona fide" reason for its action. *Id.* at 769. Given the authority of the political branches over admission, we held that "when the Executive exercises this [delegated] power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification" against the asserted constitutional interests of U.S. citizens. *Id.* at 770.

The Supreme Court then later confirmed that *Mandel*'s deferential test applies equally to congressional decisionmaking. In *Fiallo*, decided in 1977, the Supreme Court considered a congressional law giving immigration preferences to mothers of illegitimate children. 430 U.S. at 795. In other words, the state created a "categorical" entry classification that discriminated on the basis of sex and legitimacy. In reviewing an equal protection challenge alleging discrimination against fathers, the Supreme Court found "no reason to review the broad congressional policy choice at issue . . . under a more exacting standard than was applied in *Kleindienst v. Mandel*, a First Amendment case." *Id.* at 795. In rejecting the constitutional challenge, the Court remarked that the issue was one "solely for the responsibility of the Congress and wholly outside the power of this Court to control." *Id.* at 799 (quotation omitted). The Court also made clear that it was "not the judicial role in [immigration cases] to probe and test the justifications for the legislative

decision." *Id.*; *see also Hawaii*, 138 S. Ct. at 2419 (citing *Fiallo*'s principle that the judiciary is not to probe the justifications underlying Congress's immigration decisions).

In the Ninth Circuit, *Mandel/Fiallo*'s "facially legitimate and bona fide" test is "equivalent to the rational basis test typically applied in equal protection cases." *Ablang v. Reno*, 52 F.3d 801, 804 (9th Cir. 1995) (applying rational-basis review and finding the Government "put forth facially bona fide and legitimate reasons" for requiring proof of paternity within a certain time limitation); *Dent v. Sessions*, 900 F.3d 1075, 1081 (9th Cir. 2018) (stating that in immigration affairs, outside of citizenship claims, "[w]e have applied *Fiallo*'s standard and looked for only a 'facially legitimate and bona fide reason' to support a statutory distinction"); *Hernandez-Mancilla v. Holder*, 633 F.3d 1182, 1185 (9th Cir. 2011) ("We review equal protection challenges to federal immigration laws under the rational basis standard . . . ."); *Ledezma-Cosino v. Sessions*, 857 F.3d 1042, 1049 (9th Cir. 2017) (for equal protection claims, "ordinary rational basis review is the appropriate standard in the immigration context").[4]

Defendant makes a passing remark in a footnote that "Courts apply strict scrutiny to laws that are 'motivated by a racial purpose of object.'" ECF No. 42 at 6 n.5 (citing *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999)). However, *Hunt* involved claims of racial gerrymandering, not immigration law, and thus has no bearing on the proper level of scrutiny here. *Contrast Hunt*, 526 U.S. at 1548-49 ("[o]ur decisions have established that all laws that classify citizens on the basis of race, including racially gerrymandered

---

[4]      In a concurring opinion in *Ledezma-Cosino*, three judges presented their view, citing *Mandel/Fiallo*, that the government's burden in the immigration context is "even lighter than rational basis: We approve immigration laws that are facially legitimate without probing or testing possible justifications." *Ledezma-Cosino*, 857 F.3d at 1050 (Kozinski, J., concurring). And in *Hawaii*, the Supreme Court stated that "[a] conventional application of *Mandel*, asking only whether the policy is facially legitimate and bona fide, would put an end to our review." 138 S. Ct. at 2420. Nonetheless, at the Government's suggestion, the Court went further to apply rational basis review to the immigration policy at issue. In any event, regardless of the precise standard of review, it is no more than rational basis, which is easily met here.

districting schemes, are constitutionally suspect and must be strictly scrutinized"), *with Fiallo*, 430 U.S. at 792 ("[W]e observed recently that in the exercise of its broad power over immigration and naturalization, Congress regularly makes rules that would be unacceptable if applied to citizens.") (quotation omitted).[5]

## 2. *The Rational-Basis Test*

The rational-basis test is an "exceedingly low level of judicial scrutiny." *Aleman v. Glickman*, 217 F.3d 1191, 1201 (9th Cir. 2000). The test is met where "there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993). "[T]he government 'has no obligation to produce evidence to sustain the rationality of a statutory classification'; '[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.'" *Glickman*, 217 F.3d at 1201 (quoting *Heller*, 509 U.S. at 320).

"The rational basis standard . . . does not require that the [governmental entity] choose the best means of advancing its goals." *Vermouth v. Corrothers*, 827 F.2d 599, 603 (9th Cir. 1987). Instead, all that is needed is some "rational connection" between the rule and the governmental interest, regardless of whether that rule is an "exact fit" for the interest at issue. *Mauro v. Arpaio*, 188 F.3d 1054, 1059–60 (9th Cir. 1999). Moreover, rational-basis review allows for decisions "based on rational speculation unsupported by evidence or empirical data." *United States v. Navarro*, 800 F.3d 1104, 1114 (9th Cir. 2015). //

---

[5] In any event, given Congress' plenary authority over immigration, the illegal entry law of § 1325 would satisfy strict scrutiny. "To satisfy strict scrutiny, the State must demonstrate that its districting legislation is narrowly tailored to achieve a compelling interest. *Miller v. Johnson*, 515 U.S. 900, 920 (1995). "It is axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity." *United States v. Cortez-Rocha*, 394 F.3d 1115, 1123 (9th Cir. 2005) (citing *United States v. Ramsey*, 431 U.S. 606, 616 (1977)); *see also United States v. Flores-Montano*, 541 U.S. 149, 152 (2004) ("The Government's interest in preventing the entry of unwanted persons . . . is at its zenith at the international border."). Section 1325, applicable to any alien who unlawfully enters the United States, achieves that interest, in the most possible tailored way.

### 3. *The Rational-Basis Test is Satisfied*

The United States has a legitimate interest in deterring illegal entry. And there is a clear rational relationship between that interest and Section 1325, which criminalizes—and thereby deters—attempted illegal entry. *See, e.g., United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998) ("In fact, it is plain that § 1326 is a necessary piece of the immigration-regulation framework; without the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined—all bark and no bite.").[6] Defendant's own exhibits outline the goal of deterrence Congress had in mind with the illegal entry law:

> Under the present law all that can be done to [an alien who enters illegally] is to deport him. It is believed that if the class of aliens who are endeavoring to enter the United States surreptitiously become aware that when detected they will be fined and imprisoned, as well as deported, the number who attempt to smuggle themselves or have themselves smuggled into the United States will be materially lessened.

Defense Exhibit I, p. 170-71; *see also* H.R. Rep. No. 2418 at 7.

As the Supreme Court recently stated, "it should come as no surprise that the Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny." *Hawaii*, 138 S. Ct. at 2420. "On the few occasions where we have done so, a common thread has been that the laws at issue lack any purpose other than a 'bare . . . desire to harm a politically unpopular group.'" *Id.* (*citing Department of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973). That is clearly not the case here with Section 1325 – a law seeking to deter all aliens from illegally entering the United States.

Defendant cites the higher percentage of illegal-entry prosecutions of Mexican and Latin American defendants as proof of disparate impact and discrimination. It is not. Those

---

[6] *Hernandez-Guerrero* went on to state that, "[b]ecause its clear purpose is to deter aliens who have been forced to leave the United States from reentering the United States, § 1326 is well within the ambit of Congress's sweeping power over immigration matters." *Id.* (citations and formatting omitted).

numbers are a product of geography, not discrimination. For instance, in FY19, the United States Border Patrol had 859,501 total encounters. *See* https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics. Ninety-nine percent of these encounters (851,508) occurred on the southwest border. *See* https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2019.

These numbers are neither surprising nor illuminating of Congress's motives in the 1920's. Indeed, if it were enough to state an equal protection claim that a broad-scale immigration law disparately impacted individuals of any particular ethnicity—to include those from a country sharing 1,954 miles of border with the United States—virtually any such law could be challenged on that ground. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1915-16 (2020) (plurality opinion) (finding that the disparate impact of DACA rescission on Latinos from Mexico—totaling 78% of DACA recipients—did not establish a plausible equal protection claim; "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds") (citation omitted);[7] *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979) ("When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern."). Section 1325 easily passes the rational basis test and does not violate the equal protection clause.

### 4. *Arlington Heights*

Defendant relies almost exclusively on *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977). But *Arlington Heights* is

---

[7]    For this same reason, Defendant's attempt to show disparate impact under *Arlington Heights* fails. *See* ECF No. 42 at 15.

inapplicable here.[8] Indeed, Defendant fails to cite any case finding the rubric of *Arlington Heights* applicable to immigration laws passed by Congress. For good reason: the expansive *Arlington Heights* inquiry is antithetical to the longstanding principle that, with regard to congressional immigration policy, it is "not the judicial role . . . to probe and test the justifications for the legislative decision." *Fiallo*, 430 U.S. at 799. There is no probe more exacting than *Arlington Heights*, which invites inquiry into "circumstantial and direct evidence of intent," the "historical background of the decision," the "specific sequence of events leading up to the challenged decision," and the "legislative or administrative history." 429 U.S. at 267-68. This does not comport with the plenary power given to Congress over immigration policy and the narrow judicial review over such policymaking.

Separately, Defendant cannot escape the reality that the "governing statutory framework" of United States' immigration law comes from 1952, when Congress replaced prior disparate statutes with the comprehensive INA. *See* Pub. L. No. 82-414, 66 Stat. 163 (codified as amended at 8 U.S.C. § 1 et seq.); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 756 (9th Cir. 2018). Nor can he escape the fact that the crime he is charged with—attempted entry—was not even a crime until 1990. Or that 8 U.S.C. § 1325 has been updated or modified several additional times by Congress—including in 1986, 1991, and 1996. Defendant's motion waves away this lengthy congressional record, claiming "later reenactments do not cleanse the law of its original taint." ECF No. 42 at 14.

Under Defendant's view, the taint of prior discriminatory intent forever prevents the criminalization of illegal entry. This makes little sense. Whether intentional discrimination existed in 1929 legislation—a point contested below—is a question about the motives of the 1929 legislature. Legislative intent is not an artifact that "carr [ies] over" from one law to the next; it must be decided anew with each successive enactment. *See, e.g., Mobile v.*

---

[8]    *Arlington Heights* involved a rezoning request to accommodate the placement of low-income housing, "which would probably be racially integrated." *Id.* at 258. In other words, it is far from the circumstance here involving the plenary power of Congress over immigration affairs.

1    *Bolden*, 446 U.S. 55, 74 (1980) (plurality opinion) (inquiring "whether a discriminatory

2    intent has been proved" as to the particular enactment at issue, because "past discrimination

3    cannot . . . condemn governmental action that is not itself unlawful"); *cf. Palmer v.*

4    *Thompson*, 403 U.S. 217, 225 (1971) (contemplating that a law invalidated because of

5    improper motive might "be valid" if the legislature "repassed it for different reasons").

6         The cases Defendant relies on for his "forever tainted" argument do not support it.

7    In *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), the Supreme Court held that the Sixth

8    Amendment, as incorporated against the states, requires that a jury find a criminal

9    defendant guilty by a unanimous verdict. That result flowed simply from a historical and

10   textual analysis of the Sixth Amendment, e.g., that a "trial by an impartial jury"

11   "unmistakabl[y]" required a jury to "reach a unanimous verdict in order to convict." *Id.* at

12   1395. The Court did not hold that the origins of the state laws at issue were the basis for

13   invalidating those state laws. On the contrary, the majority, even while commenting on the

14   racist origins, explicitly stated that "the dissent is right about one thing—a jurisdiction

15   adopting a nonunanimous jury rule even for benign reasons would still violate the Sixth

16   Amendment." *Id.* at 1401 n.44; *see id.* at 1426 (Alito, J., dissenting) ("If Louisiana and

17   Oregon originally adopted their laws allowing non-unanimous verdicts for these reasons,

18   that is deplorable, but what does that have to do with the broad constitutional question

19   before us? The answer is: nothing."). Defendant's characterization of *Ramos* is that the

20   Court's discussion of the racial underpinnings of the state law drove the outcome. Instead,

21   as the majority acknowledged, it was entirely superfluous. In any event, *Ramos* has no

22   applicability here because it does not involve immigration law and the concomitant

23   deferential standard of review.

24         *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020), is similarly

25   irrelevant. There, the Supreme Court considered whether application of a "no-aid"

26   provision in Montana's constitution to bar religious schools from participating in a state

27   scholarship program violated the Free Exercise Clause of the First Amendment. *Id.* at 2254.

28   The answer was yes, because the provision "plainly exclude[d] schools from government

aid solely because of religious status." *Id.* at 2255. The provision was not found unconstitutional because of any "checkered tradition," as Defendant suggests. ECF No. 42 at 13. That phrase appears briefly in the opinion in response to the argument that a tradition arose in the second half of the 19th century against state support for religious schools. *Espinoza*, 140 S. Ct. at 2258. The Court rejected that movement as illuminating the historical understanding of the Free Exercise Clause. *Id.* at 2259 ("The no-aid provisions of the 19th century hardly evince a tradition that should inform our understanding of the Free Exercise Clause."). In other words, neither *Ramos* nor *Espinoza* stands for the proposition Defendant claims—that "not only do courts examine the racial motivations of a law at the time of its passage, later reenactments do not cleanse the law of its original taint." ECF No. 42 at 14.

As a final example of Defendant's erroneous taint argument, several courts of appeals have recognized that, when a State reenacts a particular voting provision that was intentionally discriminatory when first enacted, the ultimate focus in any subsequent litigation must be the intent of the reenacting legislature, not the original one. *See Hayden v. Patterson*, 594 F.3d 150, 166-167 (2d Cir. 2010) (addressing felon-disenfranchisement law); *Johnson v. Governor*, 405 F.3d 1214, 1223-1224 (11th Cir.) (en banc) (same); *Cotton v. Fordice*, 157 F.3d 388, 391-392 & n.7 (5th Cir. 1998) (same); *Chen v. City of Houston*, 206 F.3d 502, 520-521 (5th Cir. 2000) (addressing racial-gerrymandering claim). Those courts also have rejected the proposition that prior intent "remains legally operative" unless and until some affirmative contrary showing is made. *Johnson*, 405 F.3d at 1223; *see Hayden*, 594 F.3d at 166-167; *accord Cotton*, 157 F.3d at 392 (reaffirming that plaintiff was required to show that the "*current* version" of the law was "adopted out of a desire to discriminate") (emphasis added).

In any event, even assuming Defendant's "forever tainted" position is permissible, and even assuming the Court may examine the constitutionality of legislation that does not contain the crime defendant is charged with, and even assuming *Arlington Heights* applies to probe the justifications of Congress's immigration actions, Defendant's claim still fails.

To begin, Defendant does not show a disparate impact. As outlined above, the statistics Defendant cites for disparate impact are a feature of Mexico's proximity to the United States – not discrimination. This, alone, is sufficient to reject Defendant's *Arlington Heights* analysis. *See, e.g.,* ECF No. 42 at 15 (Defendant admitting that *Arlington Heights* requires him to establish that a law "disparately impacts a particular group"); *Regents of the Univ. of California*, 140 S. Ct. at 1915-16 ("because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds").

Moreover, Defendant's perspective that the 1920's immigration laws, leading to the 1929 illegal entry law, were premised on racial animus towards Mexicans is considerably undercut by the fact that people born "in the republic of Mexico" were not subject to the quotas established by the Immigration Act of 1924. On the contrary, an immigrant born in "the Republic of Mexico" was defined as a non-quota immigrant on par with those born in Canada and several other places. *See* Pub. L. No. 68-139, § 4, 43 Stat. 155. For some—Asia, for instance—the quota system completely excluded immigration. *See* https://history.state.gov/milestones/1921-1936/immigration-act. These facts do not comport with Defendant's view that Congress was developing legislation with the intent and purpose of discriminating against persons from Mexico.

Relatedly, "no [Supreme Court] case . . . has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it." *Palmer v. Thompson*, 403 U.S. 217, 224 (1971). Indeed, the Supreme Court, in *United States v. O'Brien*, 391 U.S. 367, 383 (1968), cautioned of "the hazards of declaring a law unconstitutional because of the motivations of its sponsors. First, it is extremely difficult for a court to ascertain the motivation, or collection of different motivations, that lie behind a legislative enactment," *Palmer*, 403 U.S. at 224 (citing *O'Brien*, 391 U.S. at 383, 384), "that is [otherwise], under well-settled criteria, constitutional on its face, on the basis of

what fewer than a handful of Congressmen said about it," *O'Brien*, 391 U.S. at 384. "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for [courts] to eschew guesswork." *Id.*

At the conclusion of the *Arlington Heights* analysis Defendant claims the United States would have to show that the contested law would have passed "even had the impermissible purpose not been considered." ECF No. 42 at 16 (citing *Arlington Heights*). There is no need to reach this point. And in any event, Congress *did* pass a new illegal entry law in 1952 (and a new attempted entry law in 1990), and Defendant does not suggest any discriminatory purpose with those pieces of legislation.

Finally, there is no need for an evidentiary hearing. Defendant's entire claim rests on *Arlington Heights*. But his claim fails for many reasons besides *Arlington Heights*. There is therefore no reason to hold an evidentiary hearing. *See, e.g., United States v. Irwin*, 612 F.2d 1182, 1187 (1980) (evidentiary hearing not required where the material provided to the court "show as a matter of law that [the defendant] was not entitled to relief").

III

RESPONSE TO DEFENDANT'S MOTION

TO PROHIBIT CIVIL ARREST

A.   *Defendant's Request for Injunctive Relief Against a Non-Party Fails*

While Defendant shies away from explicitly saying so, his motion clearly seeks injunctive relief from the Court. Indeed, Defendant seeks an order of the Court preventing the Department of Homeland Security from taking certain action following conclusion of this criminal case. *See, e.g., Injunction*, Black's Law Dictionary (11th ed. 2019) (defining an injunction as a "court order commanding or preventing an action"). For multiple reasons, this requested injunctive relief is not appropriate.

First, even if Defendant's requested relief was possible in this action, and it is not, this Court is not authorized to grant the requested injunctive relief. Section 636 of the Federal Magistrates Act delineates the jurisdiction and powers of magistrate judges. 28

15

U.S.C. § 636. Section 636(b)(1)(A) expressly prohibits magistrate judges from issuing injunctive relief. *See, e.g., United States v. Rivera-Guerrero*, 377 F.3d 1064, 1067 n.1 (9th Cir. 2004).

Second, the Court has no jurisdiction to enjoin the actions of a non-party. "A federal court may issue an injunction if it has personal jurisdiction over the parties and subject matter jurisdiction over the claim; it may not attempt to determine the rights of persons not before the court." *Zepeda v. United States Immigration Service*, 753 F.2d 719, 727 (9th Cir. 1985); *see Jones v. Donovan*, No. 19-55206, 2020 WL 4037567, at *1 (9th Cir. July 17, 2020) ("The district court did not abuse its discretion by denying Jones's motion for a permanent injunction because the district court lacked the authority to grant Jones's requested relief as it was related to non-parties."); *Keen v. Noble*, No. CVF04-5645AWIWMWP, 2007 WL 2729246, at *2 (E.D. Cal. Sept. 18, 2007) ("The court is unable to issue any order against individuals who are not parties to a suit pending before it."). The Department of Homeland Security is not a party to this action; the Court therefore has no jurisdiction in this case to enjoin their potential post-judgment actions. The four district court cases Defendant cites illustrate the jurisdictional flaw in Defendant's motion. In each, the Department of Homeland Security, or a component agency, was the named defendant in a civil lawsuit seeking injunctive relief. *See, e.g.*, *Ryan v. U.S. Immigration & Customs Enf't,* 382 F. Supp. 3d 142 (D. Mass. 2019); *New York v. U.S. Immigration & Customs Enf't*, 431 F. Supp. 3d 377 (S.D.N.Y. 2019); *Washington v. U.S. Dep'y of Homeland Sec.*, No. C19-2043 TSZ, 2020 WL 1819837 (W.D. Wash. Apr. 10, 2020); *New York v. U.S. Immigration & Customs Enf't*, No. 19-cv-8876-JSR, 2020 WL 3067715 (S.D.N.Y. June 10, 2020). Defendant has had over six months to file a similar civil lawsuit; his last-minute effort to force an injunction in this criminal case should be rejected.

Third, the ripeness doctrine bars adjudication of Defendant's claim. Pursuant to Article III of the U.S. Constitution, federal courts can only adjudicate live cases or controversies. *See Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) ("Our role is neither to issue advisory opinions nor to declare rights in

hypothetical cases, but to adjudicate live cases or controversies consistent with the powers granted the judiciary in Article III of the Constitution."). The ripeness doctrine is one tool that effectuates the case or controversy requirement. Its "basic rationale" is geared towards "prevent[ing] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), abrogated on other grounds in *California v. Sanders*, 430 U.S. 99 (1977). "[R]ipeness is peculiarly a question of timing, and ripeness is particularly at issue when a party seeks pre-enforcement review of a statute or regulation." *Davis v. Guam*, 785 F.3d 1311, 1317 (9th Cir. 2015) (citing *Thomas*, 220 F.3d at 1138).

"A proper ripeness inquiry contains a constitutional and a prudential component." *Bishop Paiute Tribe v. Inyo Cty.*, 863 F.3d 1144, 1153 (9th Cir. 2017). With respect to the constitutional component, a movant must "show that he has sustained or is immediately in danger of sustaining some direct injury as a resulted of the challenged official conduct and the jury or threat of injury must be both real and immediate, not conjectural or hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).  "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quotations omitted). Defendant's proffered dilemma fails this test. Whether Defendant will be arrested in court by immigration authorities after conclusion of his criminal trial is contingent on a number of factors.

- One, Defendant must actually appear for trial. A high percentage of § 1325 defendants released on bond do not.
- Two, Defendant's case must terminate while he is in court, and, if convicted, the court must give him a time-served sentence. For example, if Defendant receives a custodial sentence, then he would go into the custody of the United States Marshal.
- Three, even if Defendant appears for trial, and even if his case terminates while he is in court, and even if he does not receive a custodial sentence, immigration officials

would have to be present in order to take Defendant into custody, and attempt to do so.

Under these circumstances—where the Court "has no idea" whether the claimed harm will occur—the issue is not fit for adjudication. *Texas v. United States*, 523 U.S. at 300; *see Clinton v. Acequia, Inc.*, 94 F.3d 568, 572 (9th Cir. 1996) ("In the absence of an immediate and certain injury to a party, a dispute has not 'matured sufficiently to warrant judicial intervention.'"). Defendant's "allegations of future injury are too speculative to be 'of sufficient immediacy and reality' to satisfy the constitutional requirement of ripeness." *Davis*, 785 F.3d at 1318 (quoting *In re Coleman*, 560 F.3d 1000, 1005 (9th Cir. 2009)).

Further, even if there was a ripe case or controversy, the "prudential component" of the ripeness doctrine prohibits adjudicating Defendant's motion. "In evaluating the prudential aspects of ripeness, [the] analysis is guided by two overarching considerations: 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Thomas*, 220 F.3d at 1141. The issues here are not fit for judicial decision—the prospective arresting agency is not a party to the action; and no arrest has occurred, rendering it impossible for the Court to undertake the fact-intensive inquiry of determining the lawfulness of an arrest.[9] Given these dynamics, the issue is not appropriate for adjudication at this time. *See id.* ("The record before us is remarkably thin and sketchy, consisting only of a few conclusory affidavits."); *San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1132 (9th Cir. 1996) (stating that case "devoid of any factual context whatsoever" is not fit for review); *Am.-Arab Anti-Discrimination Comm. v. Thornburgh*, 970 F.2d 501, 510–11 (9th Cir. 1991) ("This case has come to us upon a sketchy record and with many unknown facts. Given the procedural posture of the case, the facts understandably have not been well-developed. As a result, we do not know, for example, whether the appellees are actually members of the PFLP or what specific acts the

---

[9]   8 U.S.C. § 1357(a) permits warrantless arrests by immigration authorities. And in 8 U.S.C. § 1229(e), Congress explicitly contemplated immigration arrests taking place at courthouses.

government alleges the appellees to have committed in violation of the challenged provisions. In such situations, the Supreme Court has indicated that we ought not to exercise jurisdiction.").

Fourth, and relatedly, even if all the contingencies above aligned—i.e., Defendant appears, his criminal case concludes, he does not receive a custodial sentence, immigration officials are present and intent on taking Defendant into custody, etc.—the Court would not have jurisdiction to enjoin any attempted immigration arrest. Indeed, Article III justiciability requires "ongoing controversies *between litigants*." *Deakins v. Monaghan*, 484 U.S. 193, 199 (1988) (emphasis added). Post-conviction and sentencing, this requirement would not be met. Indeed, the controversy *between the litigants*—determining guilt and punishment in this criminal case—would be concluded. As stated, the Department of Homeland Security is not a litigant in this action; nor are its immigration enforcement efforts an issue in controversy in this criminal case. Accordingly, there would be no proper case or controversy for the Court to address. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) ("If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so.").

Defendant's petition to the Court's "supervisory powers" similarly fails. No case stands for the principle that these supervisory powers permit the Court to issue an injunction over the actions of a non-party to the action. Neither does Defendant cite any case supporting the prospect that a court's "supervisory powers" permits the Court to act outside of an Article III case or controversy.

B.    *Defendant's Sixth Amendment Claims Are Non-Justiciable, Speculative, and Insufficient to Warrant an Injunction*

Defendant's attempt to make this a Sixth Amendment issue similarly fails for lack of standing. To establish constitutional standing, a party must show: (1) that he suffered an injury in fact; (2) the injury was fairly traceable to the challenged conduct of the opposing party; and (3) the injury was likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defenders of Wildlife*, 504

U.S. 555, 560–61 (1992); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)). "To establish an injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560).

Here, Defendant's motion contains no facts supporting his assertions. *See* Crim. L.R. 47.1(g) (stating that a "motion requiring a predicate factual finding must be supported by declarations"). For instance, he claims witnesses are chilled from appearing in court, but he does not identify who they are, what material evidence they have in this illegal entry case, or whether the witnesses are even illegally present in the United States. Likewise, Defendant fails to provide any evidence—because he cannot—showing that any witnesses in § 1325 cases have been arrested in court. Defendant has not suffered an actual or imminent injury.[10] Instead, his claims are speculative, hypothetical, and insufficient to demonstrate injury in fact.

Finally, the speculative nature of Defendant's claim fails the test for an injunction. For an injunction to issue, a movant must "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tip in his favor, and that an injunction is in the public interest." *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citation omitted). With respect to irreparable harm, a mere possibility is insufficient; likelihood is required.

---

[10]   Defendant also claims that officers "may stalk him down corridors, watch him from the back of the courtroom, and arrest him for a civil deportation proceeding at their whimsy." ECF No. 42 at 24. But he provides no evidence that he has been "stalked" in the courthouse—it appears he has only appeared in court once since his release from custody on February 21, 2020—or that anyone in this court is arrested at the "whimsy" of an immigration officer. Moreover, Defendant fails to articulate how any subjective apprehension on his part of coming to court implicates his right to present a defense. For example, like many defendants, at the conclusion of his trial Defendant may go into the custody of the U.S. Marshal. That prospect cannot mean Defendant's Sixth Amendment rights are infringed.

*Id.* at 22. Defendant's motion—unsupported by any declarations or facts—fails all of these prongs. *See, e.g., Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) (even where movant seeking injunction provided affidavits in support, these affidavits failed to establish irreparable harm because they were "conclusory and without sufficient support in facts").

C.  *Defendant's Request for a Stay Should Be Denied*

The Court should likewise not issue a stay. There is no basis for any interlocutory appeal. In a criminal case, "an interlocutory order is appealable only where it affects a 'right not to be tried.'" *United States v. Samueli*, 582 F.3d 988, 992 (9th Cir. 2009). That is not a right at issue here. Nor is mandamus relief available. Among other things, "the party seeking issues of the writ must have no other adequate means to attain the relief he desires." *In re Ozenne*, 841 F.3d 810, 815 (9th Cir. 2016). As demonstrated by the cases Defendant has cited, he *does* have available means for seeking to challenge any post-conviction immigration arrest. He has simply chosen to not pursue them.

With respect to the stay request, Defendant claims he "will be irreparably harmed in that he will [be] forced to prepare with [sic] trial believing that his civil immigration arrest is likely to take place at the courthouse." ECF No. 42 at 26. It is not clear what that means. Or how that amounts to irreparable injury. Nor does Defendant provide any facts supporting this alleged harm. In sum, the proffered harm is wholly speculative and falls short of establishing likelihood of irreparable injury. *See Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction."). Further, the stay is also not in the public's interest. For this, Defendant simply states that proceeding to trial "may impact which members of the public wish to be present for court." ECF No. 42. Defendant does not expound on that at all. What is clear is that this case has been pending since February 2020, and, irrespective of whether the Speedy Trial Act applies, the public has a "strong interest in the timely administration of justice." *United States v. Tanh Huu Lam*, 251 F.3d 852, 861 n.11 (9th Cir. 2001).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IV

CONCLUSION

Defendant's motions should be denied.


DATED: July 31, 2020                    Respectfully submitted,


                                        Robert S. Brewer, Jr.
                                        United States Attorney

                                        */s/ Colin M. McDonald*
                                        COLIN M. MCDONALD
                                        NICHOLAS J. HERNANDEZ
                                        Assistant United States Attorneys