1                 UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF CALIFORNIA

3

4  UNITED STATES OF AMERICA,   )
                        )

5             Plaintiff,    )   Case No. 20mj20306
                        )

6  VS.                   )   San Diego, California
                        )

7  J. INES RUIZ-RIVERA,     )   Tuesday,
                        )   August 4, 2020

8            Defendant.    )   11:11 a.m.
  _____)

9

10

11           TRANSCRIPT OF (ZOOM) MOTION HEARING
        BEFORE THE HONORABLE ALLISON H. GODDARD

12           UNITED STATES MAGISTRATE JUDGE

13

14  APPEARANCES:

15  For the Government:    NICHOLAS HERNANDEZ
                       COLIN MCDONALD

16                       Assistant U.S. Attorneys
                       880 Front Street

17                       San Diego, California  92101

18  For the Defendant:     FEDERAL DEFENDERS OF SAN DIEGO
  (Presence waived)      BY:  CHANDRA L. PETERSON, Esq.

19                       225 Broadway
                       Suite 900

20                       San Diego, California  92101

21

22  Transcript Ordered by:   Federal Defenders

23  Transcriber:          Cameron P. Kircher

24

25  Proceedings recorded by electronic sound recording;
  transcript produced by transcription.

1    San Diego, California - Tuesday, August 4, 2020

2                    11:11 a.m.

3         THE CLERK:  Calling Matter No. 6, 20-mj-20306,

4    U.S.A. vs. J. Ines Ruiz-Rivera.

5         MS. PETERSON:  Good morning, Your Honor.  Chandra

6    Peterson with Federal Defenders on behalf of Mr. Ruiz, whose

7    presence has been waived.

8         THE COURT:  Good morning, Ms. Peterson.

9         MS. HERNANDEZ:  And good morning, Your Honor.

10   Nicholas Hernandez on behalf of the United States, along with

11   Colin McDonald.

12        (Discussion between CRD and Court.)

13        THE COURT:  Okay.  So I read the motion that was

14   filed under seal about Mr. Ruiz' status.  I really don't see

15   any possible way forward than to delay the trial.  And it's

16   with reluctance that I do so, although I understand he can't

17   come to the courthouse.  But what are we going to do to

18   prevent this from happening as far as who he is living with

19   and who he is -- if he is maintaining his own quarantine, and

20   also is he maintaining social distancing with the

21   stay-at-home orders and not exposing himself to a large array

22   of people.

23        I don't know what his living situation is and I

24   don't want to make assumptions, but if we're back in this

25   situation after we've delayed the case again, it's going to

1  be of concern to the Court that if he's been exposed to a

2  whole new group of people.

3          MS. PETERSON:  Right.  So let me give the Court a

4  little bit of background.

5          THE COURT:  Yes.

6          MS. PETERSON:  So it sounds like his family is very

7  tight-knit and close, and because he can't work because he's

8  not here with permission, his family helps to take care of

9  him financially.  So he has a nephew who he lives with that

10  is his surety.  That is who he's been ordered to live with by

11  the Court, but he also has his, like, siblings.

12          It sounds like they all have a lot of contact with

13  each other, hence the multiple people testing positive for

14  COVID and everybody feeling very ill.

15          On Sunday after the family was together, it's my

16  understanding that Mr. Ruiz has not had contact with anybody

17  else aside from his nephew, who is also unfortunately sick,

18  who he lives with.  He has not been going anywhere.  He

19  hasn't -- you know, like when I spoke to him, I explained to

20  him that he needs to not also be seeing those family members,

21  which he understands now.

22          Quite frankly, he didn't understand what the CDC

23  was.  I sat down with him and actually read through the

24  website with him.  So I -- after having this situation occur

25  in a couple different contexts now in these 1325 cases, I

think that there is just a little bit of education that needs to be done on our part; and I just really didn't have that kind of understanding until this case and another case that has come up.

I did tell him that he should get tested since he's been sick.  It sounds like his niece, who is very on top of things, is trying to figure out how to get him tested without an ID.  It sounds like the county they are in is going to be requiring identification.  He doesn't have any identification.  The Mexican consulate has his property, which includes his identification, and he doesn't have a driver's license or anything like that.

So he's very aware.  He honestly didn't even realize that he couldn't come to court until I explained to him, nor does he -- despite the fact that he was coughing incessantly on the phone, nor do I think he thinks he has COVID, and he has had two family members now that have tested positive.

We're working on it, but it's not for him going out and going grocery shopping and things like that.  He's been staying home since he hasn't been feeling well.  And he's more than happy to do whatever -- he says, Ms. Chandra, whatever you need, if you need to stay home.  So he's going to do what he needs to do.

But I am concerned about whether or not he's actually going to be able to get tested, which would give us

1   like a firm date to go off of, the 14 days after that.

2        So I guess I'll kind of leave it up to the Court

3   with that, with how the Court wants to handle that.  I am

4   also trying to investigate how he can get tested if he

5   doesn't have an ID and if that's going to be an issue.

6        THE COURT:  Well, does the September 25th date

7   work --

8        MS. PETERSON:  September 25th?

9        THE COURT:  -- for everyone?

10       MS. HERNANDEZ:  That date works for the United

11  States.

12       THE COURT:  So we'll set the trial -- we'll continue

13  the trial to September 25th at 1:30.  And that should give

14  him plenty of time to get through the exposures he's had.

15       MS. PETERSON:  I think that that's right.

16       THE COURT:  Okay.  And I need you to file a notice

17  of acknowledgement of next court date.

18       Thank you.

19       MS. PETERSON:  And did the Court say 1:30?

20       THE COURT:  1:30, yes.

21       Okay.  So on the -- there is a couple of motions

22  still outstanding.  One is the government filed a motion in

23  limine to admit evidence of public record searches.  And I

24  don't know if you've had a chance to look at that,

25  Ms. Peterson.  I just want to know if you're going to oppose

1   it.

2           MS. PETERSON:  I have, Your Honor.  I don't think

3   it's -- I mean, if the Court wants to hear my argument on it

4   now, I don't think that the public searches are relevant,

5   since typically in felony cases, one of the elements that the

6   government has to prove is that the person has not

7   reapplied -- has not reapplied for admission; so that

8   testimony is generally admissible in felony trials, because

9   it goes directly to an element.

10          Here, when the individual is just charged with

11  entering without permission, and that's not what these

12  databases are for, to determine whether or not someone has

13  permission or not, it's just whether or not there is an

14  application that has been filed, and not even -- it doesn't

15  actually even encompass all of that.  It's only applications

16  that have been filed within the United States.

17          So I don't think the testimony is relevant, given

18  that that's not an element of the offense.  But that -- and

19  if the Court, you know, overrules my objection now, I will

20  probably still object in trial, just to make sure that that

21  issue is preserved, but that would be my response.

22          THE COURT:  Okay.  Mr. Hernandez.

23          MS. HERNANDEZ:  The United States would maintain its

24  position, which we filed in our motion in limine, that the

25  evidence that we're seeking to admit really corroborates many

of the elements:  That the defendant was an alien, that he

didn't have the authority or permission to be in the United

States as evidenced by the fact that he had been previously

deported.  So we maintain that position.

MS. PETERSON:  He hasn't been previously deported,

so that's also another issue, I think, like that's not what

it says.

Mr. Ruiz has never --

MS. HERNANDEZ:  Excuse me.

MS. PETERSON:  Doesn't have any prior

deportations.

THE COURT:  So I think what would be helpful to me,

because, you know, I'm a year in, but still a little new, is

if you filed a written opposition.  It can be a couple

pages.

MS. PETERSON:  I can make it very succinct, Your

Honor.  And I can do that today.

THE COURT:  I just need it before trial, even just a

couple of days is fine.  It will just help me in case I need

to take a deeper look.

Now, with respect to the second motion to dismiss.

My tentative ruling is to deny the motion to dismiss.  I've

read *Ramos*, I've read *Arlington Heights*, and I've read the

"M" case, the case out of Montana.

MS. PETERSON:  *Espinoza*.

1        THE COURT:  *Espinoza*.  It wasn't an "M" case.  It

2  was Montana.

3        I don't -- I appreciate the argument, but I don't

4  really see that *Ramos* and *Espinoza* do anything or set any

5  sort of a rule like how the defense is reading.  And I think

6  that under *Arlington Heights*, I don't think it's applicable

7  because we're talking about regulation of immigration.

8        And I think under *Fiallo vs. Bell*, the most scrutiny

9  that would apply is a rational basis, and I think we've

10  already sort of found in the previous motion to dismiss that

11  there is a rational basis, at least for the method of

12  prosecution, but I think there is a rational basis and the

13  need to regulate entry into the country.  So that's my

14  tentative on that.

15        And then let me tell you about the issue of the

16  arrest.  I -- my tentative would be to deny that as a motion

17  currently.  I think the government has it right, that this is

18  basically asking for an injunction of something that we don't

19  know is even going to happen.

20        But I -- I've read the district court cases, the

21  trial court cases, and they do say that there is a privilege,

22  a common-law privilege.  And I'm wondering if the government

23  knows of any cases where a district court has found that

24  there is no such common-law privilege anymore, there doesn't

25  exist anymore under the *Stewart* case and the Supreme Court

1    case.

2           And I don't know that it's going to help defense

3    with their motion now, but it's going to inform me as to what

4    happens if they attempt a civil arrest at the trial -- after

5    the trial.

6           The one thing I'll say, Ms. Peterson, is -- I mean,

7    I suppose at that point, even if I deny your motion, your

8    client could object to being arrested within the courtroom

9    and invoke his -- the common-law privilege; right?  That's an

10   option.

11          What has been my experience is when those arrests

12   occur within the courtroom is that because I'm here, the

13   agents are very polite.  They allow the defendant to turn

14   over -- they take steps that they wouldn't necessarily have

15   to take if they had to wait outside on the street.  People

16   are allowed to say good-bye to their family if they are

17   present.  Their property is turned over in an orderly way.

18   They are able to make sure that they have communicated phone

19   numbers and things like that.  If that happens on the street,

20   I don't really have any control over any of that.

21          So that's really -- I don't know that I have any

22   authority to essentially grant your motion now.  I don't know

23   what that means if he were to object to a civil arrest within

24   the courtroom under the common-law privilege.  I'm going to

25   do a little bit more research on that.  But from what I've

1    seen, that can be a more orderly way to do it, if he's -- if

2    the defendant is willing to comply.

3          So those are my thoughts on the motion.  It's the

4    defense motions, so I'll let you go first, Ms. Peterson, if

5    you want to make any comments or argument.

6          MS. PETERSON:  Yes.  Thank you, Your Honor.

7          So I do want to spend some time discussing the

8    two -- the Court's two points that it's made.  The first

9    being *Ramos* and *Espinoza*.  I think that part of the issue is

10   that the way that the government kind of framed what those

11   two cases are about wasn't incorrect in its briefing.

12   However, it wasn't what we were using -- the defense was

13   using *Ramos* for.

14         So the point of *Ramos* is that a reenaction of a

15   law -- and this is also the point of *Espinoza*.  The reasons

16   why we're citing those cases is that the reenaction of a law

17   does not cleanse the racist motivating factors that were

18   originally there.

19         So that is the only points that we were making with

20   those cases.  We weren't trying to say that those cases have

21   anything to do with the analysis of *Arlington Heights*, just

22   that it doesn't matter that this law was reenacted in the

23   '90s because *Ramos* and *Espinoza* say that.

24         So putting that aside, the Court's point about

25   whether or not *Arlington Heights* applies in this case, but I

1    think the second issue, and this is a little problematic, I

2    think, is that the way the government describes the law we're

3    dealing with right now in its briefing is that it's an

4    immigration law.

5         And if you read through all of the cases that the

6    government cites in response, that this is an immigration law

7    and so strict scrutiny doesn't apply or *Arlington Heights*

8    doesn't apply, it all has to do with actual immigration laws.

9         So Congress and the Executive's power to actually

10   determine who can come into the country, who can't come into

11   the country, who has to leave the country after they have

12   been in the country, depending on, you know, maybe actions

13   that they have taken, if they have committed any sort of

14   crimes, that is not what we're dealing with here.  What we're

15   dealing with is a criminal statute.

16        So this idea that in all the cases that the

17   government rely on that are saying that, Oh, this is an

18   immigration law and so there is great deference to

19   immigration law, that's correct.  When it's actually an

20   immigration law, there is great deference to immigration law,

21   because Congress and the Executive get to talk about and get

22   to make decisions about who comes into the country and who

23   doesn't come into the country.

24        This is different.  We have a criminal law that

25   seeks to take away somebody's liberty.  Okay.  And that is

just like the main fundamental difference.  And I think there
is no -- you know, we do not say that Congress doesn't have
authority to question -- you know, doesn't have the authority
to deal with admissions and deportations, but that doesn't
carry over to criminal prosecutions.

And if the Court -- I don't know if the Court plans
on issuing a ruling today, but I do have a couple cases that
I was able to find to support this.  And one is *Wong Wing vs.
United States* at 163 U.S. 228, 237.  That case held that
Congress' primary power over immigration did not give
officials a right to deprive immigrant defendants of a jury
trial.

So it's in a jury trial context, but the point is
the same.  There is this distinction between Congress' power
over immigration when we talk about admission and
deportation, not their power over criminal prosecutions.

The second case is *INS v. Lopez-Mendoza*,
468 U.S. 1032, at 1042, confirming constitutional
protections, such as the exclusionary rule, continue to apply
in criminal proceedings against noncitizens.

So I -- I get the Court's kind of thought process as
we get there, but when you actually start to separate
immigration law and criminal law, we live in this weird world
in our 1325 and our 1326 cases where we're dealing with
immigration.

1    So it feels like immigration law, but it's not.

2    It's the criminal law, and the government is seeking to take

3    away my client's liberty, and so we have to have a higher

4    standard.

5        THE COURT:  Let me ask you real quick about that,

6    though.  Because if I'm remembering correctly, the laws that

7    you're trying to tie to with the racist animus were not

8    criminal laws.  They were immigration laws; right?

9        MS. PETERSON:  The criminal section of the INA,

10   right --

11       THE COURT:  But you're trying to tie it to a law

12   that was before the INA that regulated how many -- the

13   quotas; right?

14       MS. PETERSON:  I'm sorry.  Not the INA.  I'm sorry.

15   The one before.  The Undesirable Aliens Act, right.

16       THE COURT:  Right.

17       MS. PETERSON:  So that was also the same law that

18   also criminalized it, and then that was codified in 8 USC

19   1325.

20       So that's what I'm saying, we live in this weird

21   world, but it isn't -- the immigration laws that the

22   government is citing in its cases, if you go through every

23   single one of them, it's saying that we have to show

24   deference, that this Court has to show deference, are all

25   about admissions and deportations, whether or not somebody

who claimed that they were a Marxist could be admitted under

the visa, whether or not that Congress could get -- give

deference to mothers of illegitimate children, not the

criminal law of whether or not somebody should go to jail for

a certain amount of time, whether they should lose their

liberty, which, you know, due process says when we're talking

about somebody's liberty, not these immigration laws, there

is a difference.

And so those two cases are two of them that I think

highlight that. And I think -- I want to make sure I didn't

miss anything. Those were the two cases I found that I

wanted to make sure that I brought to the Court's attention.

I think with that, I'll submit. But I do just want

to highlight that I think there is a difference, and I don't

think the government's recitation of all the immigration laws

is the same as the criminal law that we're dealing with, and

those two court cases, I think, really show the distinctions

between the criminal and the immigration law.

THE COURT: Okay. I appreciate that. Thank you.

I don't know -- so who wants to argue?

MR. MCDONALD: Your Honor, I will. Colin McDonald

for the United States.

Your Honor, I think your question honed in on a very

important point here, which is that the defense wants to

claim the immigration laws of the 1920's when it benefits

1    them, and now they have distanced themselves from those laws

2    and made this division somehow between the immigration laws

3    and the criminal laws.

4         There is no such division within the plenary power

5    of Congress to enact legislation that oversees the

6    sovereigness power over aliens.  And that's precisely what

7    Section 1325 does and achieves.  The motion, as Your Honor

8    identified in your tentative, it should properly be denied,

9    and there is a variety of reasons for that.

10         I'll start with the *Ramos* and *Espinoza* analysis.

11   And Your Honor was right, those cases do not stand for the

12   proposition that the defendants test positive, which is that

13   there is somehow a taint, a forever taint argument that the

14   Supreme Court sanctioned in those cases.  That's simply not

15   the case there.  They were -- those cases were decided purely

16   on the merits of the law itself, as compared to what the

17   Constitution would allow.

18         That's not what we have here.  Moreover, as we've

19   outlined, there is a number of reasons why else the claim

20   fails, including that the attempted entry law that this

21   defendant is charged with was not even passed until 1990.  It

22   was not a law that was passed in the 1920's.

23         We agree with Your Honor's perspective as outlined

24   in the tentative opinion.  This decision by Congress is

25   subject to, at the most, rational basis review, and even

1    that -- that might even be a little bit high; but certainly

2    under rational basis review, this law passes.  And we've even

3    made the point, even if it was strict scrutiny review, even

4    if it was, which it isn't, this would pass and for reasons

5    including the nation's need to govern its borders.

6         And so unless Your Honor has specific questions

7    about that, we would submit.

8         THE COURT:  And do you have any cases on the arrest

9    issue that say that -- that where a trial court says that

10   there is no criminal -- there is no common-law privilege

11   prohibiting arrest in the courthouse?

12        MR. MCDONALD:  So Your Honor, I have looked at that.

13   There are cases, and I do believe that that privilege does

14   not apply anymore -- or certainly in federal court and

15   anymore.  I think that that is the answer.

16        And given the case with which these motions were

17   filed and then responded to, we focused on the clear

18   jurisdictional problems with the defense arguments, including

19   that this would be an injunction that the Court would be

20   ordering on a nonparty.  The Department of Homeland Security

21   is not a party to this action, and so the Court is not able

22   to issue that injunction.

23        With respect, though, to your question as to the

24   common-law privilege, I do believe that there is case law

25   that supports the idea that this common-law privilege as

announced in the *Stewart* case, which related to really giving

personal jurisdiction, service of process for civil lawsuits,

I believe, that that is no longer in play.

And we could look into putting briefing together for

Your Honor on that point.  I think the preliminary points of

not to be able to enter an injunction over a nonparty and

those sort are preliminary points that the defense cannot

overcome, but, yes, I do believe that if we did reach the

merits, there is case law that suggests that the common-law

privilege does not apply.

THE COURT:  How about we do this, because I am going

to issue a written order.  It's not coming today, but it's

coming.

I'll give you each -- we've got a little bit more

time -- until August 11th to submit only cases that you want

me to consider; not argument.  If there is any other -- and

I've got your -- I've got those other two cases in my notes,

Ms. Peterson.  But it never hurts to put them in writing so I

don't forget them.

MS. PETERSON:  I will put them -- yeah, just so you

have them all in one place, too, Your Honor.

THE COURT:  And so I'm interested in seeing that.

First of all, let me just tell you, like, you know,

it's so nice to hear cogent argument from counsel and read

well-written briefs.  And in some ways, I'm apologetic for

requiring you to reorganize things, but I know this is a motion that's probably going to be made a couple of times, and getting it under 25 pages is really critical. These 30-, 40-page motions are unhelpful. And so I am going to start taking a hard line to the 25 pages.

I think that -- I'm not trying to make busy work, but I was able to understand and follow where you were going much better in a shorter amount of -- in the shorter number of pages. So I appreciate that you filed everything I told you, and you did it and that you're here. I think you have a smile under your mask. I can't tell, but I'll just make an assumption.

MS. PETERSON: I do. It's -- you know, it's been a really rough four or five months, so it's just nice to have that, I appreciate that. Thank you.

THE COURT: Well, that's why it's nice. I was just sitting up here thinking, God, this is so nice. I'm not just reading off a script. This is people putting thought into it and making good arguments, and I really appreciate it. So I appreciate that from all sides today.

I will issue a written order. I'll give you a week to submit any additional authorities, and then I'll see you on September 25th.

MS. PETERSON: Thank you, Your Honor.

MS. HERNANDEZ: Thank you.

1          THE COURT:   Thank you.

2               (Proceedings concluded at 11:33 a.m.)

3                          -- oo0oo --

4          I certify that the foregoing is a correct transcript

5     from the electronic sound recording of the proceedings in the

6     above-entitled matter.

7

      /s/Cameron P. Kircher          12-14-21
8     Transcriber                    Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25